ESTELLE, CORRECTIONS DIRECTOR,
ET AL. *v.* GAMBLE

No. 75-929.   Argued October 5, 1976—Decided November 30, 1976

*Bert W. Pluymen,* Assistant Attorney General of Texas, argued the cause for petitioners *pro hac vice.*   With him on

the brief were *John L. Hill,* Attorney General, *David M. Kendall,* First Assistant Attorney General, and *Joe B. Dibrell, Jr.,* Assistant Attorney General.

*Daniel K. Hedges,* by appointment of the Court, 425 U. S. 932, argued the cause and filed a brief for respondent *pro hac vice.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Respondent J. W. Gamble, an inmate of the Texas Department of Corrections, was injured on November 9, 1973, while performing a prison work assignment. On February 11, 1974, he instituted this civil rights action under 42 U. S. C. § 1983,[1] complaining of the treatment he received after the injury. Named as defendants were the petitioners, W. J. Estelle, Jr., Director of the Department of Corrections, H. H. Husbands, warden of the prison, and Dr. Ralph Gray, medical director of the Department and chief medical officer of the prison hospital. The District Court, *sua sponte,* dismissed the complaint for failure to state a claim upon which relief could be granted.[2] The Court of Appeals reversed and remanded with instructions to reinstate the complaint. 516 F. 2d 937 (CA5 1975). We granted certiorari, 424 U. S. 907 (1976).

---

[1] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[2] It appears that the petitioner-defendants were not even aware of the suit until it reached the Court of Appeals. Tr. of Oral Arg. 7, 13–15. This probably resulted because the District Court dismissed the complaint simultaneously with granting leave to file it *in forma pauperis.*

# I

Because the complaint was dismissed for failure to state a claim, we must take as true its handwritten, *pro se* allegations. *Cooper* v. *Pate,* 378 U. S. 546 (1964). According to the complaint, Gamble was injured on November 9, 1973, when a bale of cotton [3] fell on him while he was unloading a truck. He continued to work but after four hours he became stiff and was granted a pass to the unit hospital. At the hospital a medical assistant, "Captain" Blunt, checked him for a hernia and sent him back to his cell. Within two hours the pain became so intense that Gamble returned to the hospital where he was given pain pills by an inmate nurse and then was examined by a doctor. The following day, Gamble saw a Dr. Astone who diagnosed the injury as a lower back strain, prescribed Zactirin (a pain reliever) and Robaxin (a muscle relaxant),[4] and placed respondent on "cell-pass, cell-feed" status for two days, allowing him to remain in his cell at all times except for showers. On November 12, Gamble again saw Dr. Astone who continued the medication and cell-pass, cell-feed for another seven days. He also ordered that respondent be moved from an upper to a lower bunk for one week, but the prison authorities did not comply with that directive. The following week, Gamble returned to Dr. Astone. The doctor continued the muscle relaxant but prescribed a new pain reliever, Febridyne, and placed respondent on cell-pass for seven days, permitting him to remain in his cell except for meals and showers. On November 26, respondent again saw Dr. Astone, who put respondent back on the original pain reliever for five days and continued the cell-pass for another week.

---

[3] His complaint states that the bale weighed "6.00 pound." The Court of Appeals interpreted this to mean 600 pounds. 516 F. 2d 937, 938 (CA5 1975).

[4] The names and descriptions of the drugs administered to respondent are taken from his complaint. App. A–5—A–11, and his brief, at 19–20.

On December 3, despite Gamble's statement that his back hurt as much as it had the first day, Dr. Astone took him off cell-pass, thereby certifying him to be capable of light work. At the same time, Dr. Astone prescribed Febridyne for seven days. Gamble then went to a Major Muddox and told him that he was in too much pain to work. Muddox had respondent moved to "administrative segregation."[5] On December 5, Gamble was taken before the prison disciplinary committee, apparently because of his refusal to work. When the committee heard his complaint of back pain and high blood pressure, it directed that he be seen by another doctor.

On December 6, respondent saw petitioner Gray, who performed a urinalysis, blood test, and blood pressure measurement. Dr. Gray prescribed the drug Ser-Ap-Es for the high blood pressure and more Febridyne for the back pain. The following week respondent again saw Dr. Gray, who continued the Ser-Ap-Es for an additional 30 days. The prescription was not filled for four days, however, because the staff lost it. Respondent went to the unit hospital twice more in December; both times he was seen by Captain Blunt, who prescribed Tiognolos (described as a muscle relaxant). For all of December, respondent remained in administrative segregation.

In early January, Gamble was told on two occasions that he would be sent to the "farm" if he did not return to work. He refused, nonetheless, claiming to be in too much pain. On January 7, 1974, he requested to go on sick call for his back pain and migraine headaches. After an initial refusal, he saw Captain Blunt who prescribed sodium salicylate (a

---

[5] There are a number of terms in the complaint whose meaning is unclear and, with no answer from the State, must remain so. For example, "administrative segregation" is never defined. The Court of Appeals deemed it the equivalent of solitary confinement. 516 F. 2d, at 939. We note, however, that Gamble stated he was in "administrative segregation" when he was in the "32A–7 five building" and "32A20 five building," but when he was in "solitary confinement," he was in "3102 five building."

pain reliever) for seven days and Ser-Ap-Es for 30 days. Respondent returned to Captain Blunt on January 17 and January 25, and received renewals of the pain reliever prescription both times. Throughout the month, respondent was kept in administrative segregation.

On January 31, Gamble was brought before the prison disciplinary committee for his refusal to work in early January. He told the committee that he could not work because of his severe back pain and his high blood pressure. Captain Blunt testified that Gamble was in "first class" medical condition. The committee, with no further medical examination or testimony, placed respondent in solitary confinement.

Four days later, on February 4, at 8 a. m., respondent asked to see a doctor for chest pains and "blank outs." It was not until 7:30 that night that a medical assistant examined him and ordered him hospitalized. The following day a Dr. Heaton performed an electrocardiogram; one day later respondent was placed on Quinidine for treatment of irregular cardiac rhythm and moved to administrative segregation. On February 7, respondent again experienced pain in his chest, left arm, and back and asked to see a doctor. The guards refused. He asked again the next day. The guards again refused. Finally, on February 9, he was allowed to see Dr. Heaton, who ordered the Quinidine continued for three more days. On February 11, he swore out his complaint.

## II

The gravamen of respondent's § 1983 complaint is that petitioners have subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth.[6] See *Robinson* v. *Califor-*

---

[6] The Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

At oral argument, counsel for respondent agreed that his only claim was based on the Eighth Amendment. Tr. of Oral Arg. 42–43.

*nia,* 370 U. S. 660 (1962). We therefore base our evaluation of respondent's complaint on those Amendments and our decisions interpreting them.

The history of the constitutional prohibition of "cruel and unusual punishments" has been recounted at length in prior opinions of the Court and need not be repeated here. See, *e. g., Gregg* v. *Georgia,* 428 U. S. 153, 169–173 (1976) (joint opinion of STEWART, POWELL, and STEVENS, JJ. (hereinafter joint opinion)); see also Granucci, Nor Cruel and Unusual Punishment Inflicted: The Original Meaning, 57 Calif. L. Rev. 839 (1969). It suffices to note that the primary concern of the drafters was to proscribe "torture[s]" and other "barbar[ous]" methods of punishment. *Id.,* at 842. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. See *Wilkerson* v. *Utah,* 99 U. S. 130, 136 (1879) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . . ."); *In re Kemmler,* 136 U. S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . .").

Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. See, *e. g., Gregg* v. *Georgia, supra,* at 171 (joint opinion); *Trop* v. *Dulles,* 356 U. S. 86, 100–101 (1958); *Weems* v. *United States,* 217 U. S. 349, 373 (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ," *Jackson* v. *Bishop,* 404 F. 2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles, supra,* at 101; see also *Gregg* v. *Georgia, supra,* at 172–173 (joint opinion); *Weems* v. *United States, supra,* at 378,

or which "involve the unnecessary and wanton infliction of pain," *Gregg* v. *Georgia, supra,* at 173 (joint opinion); see also *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 463 (1947); *Wilkerson* v. *Utah, supra,* at 136.[7]

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler, supra,* the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. Cf. *Gregg* v. *Georgia, supra,* at 182–183 (joint opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation[8] codifying the common-

---

[7] The Amendment also proscribes punishments grossly disproportionate to the severity of the crime, *Gregg* v. *Georgia,* 428 U. S. 153, 173 (1976) (joint opinion); *Weems* v. *United States,* 217 U. S. 349, 367 (1910), and it imposes substantive limits on what can be made criminal and punished, *Robinson* v. *California,* 370 U. S. 660 (1962). Neither of these principles is involved here.

[8] See, *e. g.,* Ala. Code Tit. 45, § 125 (1958); Alaska Stat. § 33.30.050 (1975); Ariz. Rev. Stat. Ann. § 31–201.01 (Supp. 1975); Conn. Gen. Stat. Ann. § 18–7 (1975); Ga. Code Ann. § 77–309 (e) (1973); Idaho Code § 20–209 (Supp. 1976); Ill. Ann. Stat. c. 38, § 103–2 (1970); Ind. Ann. Stat. § 11–1–1.1–30.5 (1973); Kan. Stat. Ann. § 75–5429 (Supp. 1975); Md. Ann. Code Art. 27 § 698 (1976); Mass. Ann. Laws, c. 127, § 90A (1974); Mich. Stat. Ann. § 14.84 (1969); Miss. Code Ann. § 47–1–57 (1972); Mo. Ann. Stat. § 221.120 (1962); Neb. Rev. Stat. § 83–181 (1971); N. H. Rev. Stat. Ann. § 619.9 (1974); N. M. Stat. Ann. § 42–2–4 (1972); Tenn. Code Ann. §§ 41–318, 41–1115, 41–1226 (1975); Utah Code Ann. §§ 64–9–13, 64–9–19, 64–9–20, 64–9–53 (1968); Va. Code Ann. §§ 32–81, 32–82 (1973); W. Va. Code Ann. § 25–1–16 (Supp. 1976); Wyo. Stat. Ann. § 18–299 (1959).

Many States have also adopted regulations which specify, in varying

law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." [9]

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg* v. *Georgia, supra,* at 173 (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs [10] or by prison guards in intentionally denying or delaying access to medical

---

degrees of detail, the standards of medical care to be provided to prisoners. See Comment, The Rights of Prisoners to Medical Care and the Implications for Drug-Dependent Prisoners and Pretrial Detainees, 42 U. Chi. L. Rev. 705, 708–709 (1975).

Model correctional legislation and proposed minimum standards are all in accord. See American Law Institute, Model Penal Code §§ 303.4, 304.5 (1962); National Advisory Commission on Criminal Justice Standards and Goals, Standards on Rights of Offenders, Standard 2.6 (1973); National Council on Crime and Delinquency, Model Act for the Protection of Rights of Prisoners, § 1 (b) (1972); National Sheriffs' Association, Standards for Inmates' Legal Rights, Right No. 3 (1974); Fourth United Nations Congress on Prevention of Crime and Treatment of Offenders, Standard Minimum Rules for the Treatment of Prisoners, Rules 22–26 (1955). The foregoing may all be found in U. S. Dept. of Justice, Law Enforcement Assistance Administration, Compendium of Model Correctional Legislation and Standards (2d ed. 1975).

[9] *Spicer* v. *Williamson,* 191 N. C. 487, 490, 132 S. E. 291, 293 (1926).

[10] See, *e. g., Williams* v. *Vincent,* 508 F. 2d 541 (CA2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference . . . rather than an exercise of professional judgment"); *Thomas* v. *Pate,* 493 F. 2d 151, 158 (CA7), cert. denied *sub nom. Thomas* v. *Cannon,* 419 U. S. 879 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones* v. *Lockhart,* 484 F. 2d 1192 (CA8 1973) (refusal of paramedic to provide treatment); *Martinez* v. *Mancusi,* 443 F. 2d 921 (CA2 1970), cert. denied, 401 U. S. 983 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

care[11] or intentionally interfering with the treatment once prescribed.[12] Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. In *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947), for example, the Court concluded that it was not unconstitutional to force a prisoner to undergo a second effort to electrocute him after a mechanical malfunction had thwarted the first attempt. Writing for the plurality, Mr. Justice Reed reasoned that the second execution would not violate the Eighth Amendment because the first attempt was an "unforeseeable accident." *Id.,* at 464. Mr. Justice Frankfurter's concurrence, based solely on the Due Process Clause of the Fourteenth Amendment, concluded that since the first attempt had failed because of "an innocent misadventure," *id.,* at 470, the second would not be " 'repugnant to the conscience of mankind,' " *id.,* at 471, quoting *Palko* v. *Connecticut,* 302 U. S. 319, 323 (1937).[13]

Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be

---

[11] See, *e. g., Westlake* v. *Lucas,* 537 F. 2d 857 (CA6 1976); *Thomas* v. *Pate, supra,* at 158–159; *Fitzke* v. *Shappell,* 468 F. 2d 1072 (CA6 1972); *Hutchens* v. *Alabama,* 466 F. 2d 507 (CA5 1972); *Riley* v. *Rhay,* 407 F. 2d 496 (CA9 1969); *Edwards* v. *Duncan,* 355 F. 2d 993 (CA4 1966); *Hughes* v. *Noble,* 295 F. 2d 495 (CA5 1961).

[12] See, *e. g., Wilbron* v. *Hutto,* 509 F. 2d 621, 622 (CA8 1975); *Campbell* v. *Beto,* 460 F. 2d 765 (CA5 1972); *Martinez* v. *Mancusi, supra; Tolbert* v. *Eyman,* 434 F. 2d 625 (CA9 1970); *Edwards* v. *Duncan, supra.*

[13] He noted, however, that "a series of abortive attempts" or "a single, cruelly willful attempt" would present a different case. 329 U. S., at 471.

"repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.[14]

## III

Against this backdrop, we now consider whether respondent's complaint states a cognizable § 1983 claim. The handwritten *pro se* document is to be liberally construed. As the Court unanimously held in *Haines* v. *Kerner,* 404 U. S. 519 (1972), a *pro se* complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.,* at 520–521, quoting *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957).

---

[14] The Courts of Appeals are in essential agreement with this standard. All agree that mere allegations of malpractice do not state a claim, and, while their terminology regarding what is sufficient varies, their results are not inconsistent with the standard of deliberate indifference. See *Page* v. *Sharpe,* 487 F. 2d 567, 569 (CA1 1973); *Williams* v. *Vincent, supra,* at 544 (uses the phrase "deliberate indifference"); *Gittlemacker* v. *Prasse,* 428 F. 2d 1, 6 (CA3 1970); *Russell* v. *Sheffer,* 528 F. 2d 318 (CA4 1975); *Newman* v. *Alabama,* 503 F. 2d 1320, 1330 n. 14 (CA5 1974), cert. denied, 421 U. S. 948 (1975) ("callous indifference"); *Westlake* v. *Lucas, supra,* at 860 ("deliberate indifference"); *Thomas* v. *Pate, supra,* at 158; *Wilbron* v. *Hutto, supra,* at 622 ("deliberate indifference"); *Tolbert* v. *Eyman, supra,* at 626; *Dewell* v. *Lawson,* 489 F. 2d 877, 881–882 (CA10 1974).

Even applying these liberal standards, however, Gamble's claims against Dr. Gray, both in his capacity as treating physician and as medical director of the Corrections Department, are not cognizable under § 1983. Gamble was seen by medical personnel on 17 occasions spanning a three-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. They treated his back injury, high blood pressure, and heart problems. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury." Response to Pet. for Cert. 4; see also Brief for Respondent 19. The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants, and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. *Id.*, at 17, 19. The Court of Appeals agreed, stating: "Certainly an X-ray of [Gamble's] lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F. 2d, at 941. But the question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.[15] The Court of Appeals was in error in holding that the alleged insufficiency of the

---

[15] Tex. Rev. Civ. Stat., Art. 6252–19, § 3 (Supp. 1976). Petitioners assured the Court at argument that this statute can be used by prisoners to assert malpractice claims. Tr. of Oral Arg. 6.

medical treatment required reversal and remand. That portion of the judgment of the District Court should have been affirmed.[16]

The Court of Appeals focused primarily on the alleged actions of the doctors, and did not separately consider whether the allegations against the Director of the Department of Corrections, Estelle, and the warden of the prison, Husbands, stated a cause of action. Although we reverse the judgment as to the medical director, we remand the case to the Court of Appeals to allow it an opportunity to consider, in conformity with this opinion, whether a cause of action has been stated against the other prison officials.

*It is so ordered.*

MR. JUSTICE BLACKMUN concurs in the judgment of the Court.

MR. JUSTICE STEVENS, dissenting.

Most of what is said in the Court's opinion is entirely consistent with the way the lower federal courts have been processing claims that the medical treatment of prison inmates is so inadequate as to constitute the cruel and unusual punishment prohibited by the Eighth Amendment. I have no serious disagreement with the way this area of the law has developed thus far, or with the probable impact of this opinion. Nevertheless, there are three reasons why I am unable to join it. First, insofar as the opinion orders the dismissal of the complaint against the chief medical

---

[16] Contrary to MR. JUSTICE STEVENS' assertion in dissent, this case signals no retreat from *Haines* v. *Kerner,* 404 U. S. 519 (1972). In contrast to the general allegations in *Haines,* Gamble's complaint provides a detailed factual accounting of the treatment he received. By his exhaustive description he renders speculation unnecessary. It is apparent from his complaint that he received extensive medical care and that the doctors were not indifferent to his needs.

officer of the prison, it is not faithful to the rule normally applied in construing the allegations in a pleading prepared by an uncounseled inmate. Second, it does not adequately explain why the Court granted certiorari in this case. Third, it describes the State's duty to provide adequate medical care to prisoners in ambiguous terms which incorrectly relate to the subjective motivation of persons accused of violating the Eighth Amendment rather than to the standard of care required by the Constitution.

## I

The complaint represents a crude attempt to challenge the system of administering medical care in the prison where Gamble is confined. Fairly construed, the complaint alleges that he received a serious disabling back injury in November 1973, that the responsible prison authorities were indifferent to his medical needs, and that as a result of that indifference he has been mistreated and his condition has worsened.

The indifference is allegedly manifested, not merely by the failure or refusal to diagnose and treat his injury properly, but also by the conduct of the prison staff. Gamble was placed in solitary confinement for prolonged periods as punishment for refusing to perform assigned work which he was physically unable to perform.[1] The only medical evidence presented to the disciplinary committee was the statement of a medical assistant that he was in first-class condition, when in fact he was suffering not only from the back sprain but from high blood pressure. Prison guards refused

---

[1] In his complaint, Gamble alleged that he had been placed in administrative segregation and remained there through December and January. At the end of January he was placed in solitary confinement. In an affidavit filed in the Court of Appeals the following December, see n. 8, *infra*, Gamble alleged that with the exception of one day in which he was taken out of solitary to be brought before the disciplinary committee, he had remained in solitary up to the date of the affidavit.

to permit him to sleep in the bunk that a doctor had assigned. On at least one occasion a medical prescription was not filled for four days because it was lost by staff personnel. When he suffered chest pains and blackouts while in solitary, he was forced to wait 12 hours to see a doctor because clearance had to be obtained from the warden. His complaint also draws into question the character of the attention he received from the doctors and the inmate nurse in response to his 17 attempts to obtain proper diagnosis and treatment for his condition. However, apart from the medical director who saw him twice, he has not sued any of the individuals who saw him on these occasions. In short, he complains that the system as a whole is inadequate.

On the basis of Gamble's handwritten complaint it is impossible to assess the quality of the medical attention he received. As the Court points out, even if what he alleges is true, the doctors may be guilty of nothing more than negligence or malpractice. On the other hand, it is surely not inconceivable that an overworked, undermanned medical staff in a crowded prison [2] is following the expedient course of routinely prescribing nothing more than pain killers when a thorough diagnosis would disclose an obvious need for remedial treatment.[3] Three fine judges

---

[2] According to a state legislative report quoted by the Court of Appeals, the Texas Department of Corrections has had at various times one to three doctors to care for 17,000 inmates with occasional part-time help. 516 F. 2d 937, 940–941, n. 1 (1975).

[3] This poorly drafted complaint attempts to describe conditions which resemble those reported in other prison systems. For instance, a study of the Pennsylvania prison system reported:

"When ill, the prisoner's point of contact with a prison's health care program is the sick-call line. Access may be barred by a guard, who refuses to give the convict a hospital pass out of whimsy or prejudice, or in light of a history of undiagnosed complaints. At sick call the convict commonly first sees a civilian paraprofessional or a nurse, who may treat the case with a placebo without actual examination, history-taking or recorded diagnosis. Even seeing the doctor at some prisons produces no

sitting on the United States Court of Appeals for the Fifth Circuit [4] thought that enough had been alleged to require some inquiry into the actual facts. If this Court meant what it said in *Haines* v. *Kerner,* 404 U. S. 519, these judges were clearly right.[5]

more than aspirin for symptoms, such as dizziness and fainting, which have persisted for years." Health Law Project, University of Pennsylvania, Health Care and Conditions in Pennsylvania's State Prisons, in American Bar Association Commission on Correctional Facilities and Services, Medical and Health Care in Jails, Prisons, and Other Correctional Facilities: A Compilation of Standards and Materials 71, 81–82 (Aug. 1974).

A legislative report on California prisons found:

"By far, the area with the greatest problem at the hospital [at one major prison], and perhaps at all the hospitals, was that of the abusive doctor-patient relationship. Although the indifference of M. T. A.s [medical technical assistants] toward medical complaints by inmates is not unique at Folsom, and has been reported continuously elsewhere, the calloused and frequently hostile attitude exhibited by the doctors is uniquely reprehensible. . . .

"Typical complaints against [one doctor] were that he would . . . not adequately diagnose or treat a patient who was a disciplinary problem at the prison . . . ." Assembly Select Committee on Prison Reform and Rehabilitation, An Examination of California's Prison Hospitals, 60–61 (1972).

These statements by responsible observers demonstrate that it is far from fanciful to read a prisoner's complaint as alleging that only *pro forma* treatment was provided.

[4] The panel included Mr. Justice Clark, a retired member of this Court, sitting by designation, and Circuit Judges Goldberg and Ainsworth.

[5] In *Haines* a unanimous Supreme Court admonished the federal judiciary to be especially solicitous of the problems of the uneducated inmate seeking to litigate on his own behalf. The Court said:

"Whatever may be the limits on the scope of inquiry of courts into the internal administration of prisons, allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the *pro se* complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears 'beyond doubt that the plaintiff can prove no set of facts in support of

112

The *Haines* test is not whether the facts alleged in the complaint would entitle the plaintiff to relief. Rather, it is whether the Court can say with assurance on the basis of the complaint that, beyond any doubt, *no* set of facts could be proved that would entitle the plaintiff to relief.[6] The reasons for the *Haines* test are manifest. A *pro se* complaint provides an unsatisfactory foundation for deciding the merits of important questions because typically it is inartfully drawn, unclear, and equivocal, and because thorough pleadings, affidavits, and possibly an evidentiary hearing will usually bring out facts which simplify or make unnecessary the decision of questions presented by the naked complaint.[7]

---

his claim which would entitle him to relief.' *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957). See *Dioguardi* v. *Durning,* 139 F. 2d 774 (CA2 1944)." 404 U. S., at 520–521.

Under that test the complaint should not have been dismissed without, at the very minimum, requiring some response from the defendants. It appears from the record that although the complaint was filed in February, instead of causing it to be served on the defendants as required by Fed. Rule Civ. Proc. 4, the Clerk of the District Court referred it to a magistrate who decided in June that the case should be dismissed before any of the normal procedures were even commenced. At least one Circuit has held that dismissal without service on the defendants is improper, *Nichols* v. *Schubert,* 499 F. 2d 946 (CA7 1974). The Court's disposition of this case should not be taken as an endorsement of this practice since the question was not raised by the parties.

[6] This is the test actually applied in *Haines,* for although the Court ordered the complaint reinstated, it expressly "intimate[d] no view whatever on the merits of petitioner's allegations," 404 U. S., at 521. It is significant that the Court took this approach despite being pressed by the State to decide the merits. As in this case, the State argued forcefully that the facts alleged in the complaint did not amount to a constitutional violation. (Only in one footnote in its 51-page brief did the State discuss the pleading question, Brief for Respondents 22–23, n. 20, in No. 70–5025, O. T. 1971.) Yet, this Court devoted not a single word of its opinion to answering the argument that no constitutional violation was alleged.

[7] Thus, *Haines* teaches that the decision on the merits of the complaint

Admittedly, it is tempting to eliminate the meritless complaint at the pleading stage. Unfortunately, this "is another instance of judicial haste which in the long run makes waste," *Dioguardi* v. *Durning,* 139 F. 2d 774, 775 (CA2 1944) (Clark, J.), cited with approval in *Haines* v. *Kerner, supra,* at 521. In the instant case, if the District Court had resisted the temptation of premature dismissal, the case might long since have ended with the filing of medical records or affidavits demonstrating adequate treatment. Likewise, if the decision of the Fifth Circuit reinstating the complaint had been allowed to stand and the case had run its normal course, the litigation probably would have come to an end without the need for review by this Court. Even if the Fifth Circuit had wrongly decided the pleading issue, no great harm would have been done by requiring the State to produce its medical records and move for summary judgment. Instead, the case has been prolonged by two stages of appellate review, and is still not over: The case against two of the defendants may still proceed, and even the

should normally be postponed until the facts have been ascertained. The same approach was taken in *Polk Co.* v. *Glover,* 305 U. S. 5, in which the Court reversed the dismissal of a complaint, without intimating any view of the constitutional issues, on "[t]he salutary principle that the essential facts should be determined before passing upon grave constitutional questions . . . ." *Id.,* at 10. See also *Borden's Co.* v. *Baldwin,* 293 U. S. 194, 213 (Cardozo and Stone, JJ., concurring in result). This approach potentially avoids the necessity of ever deciding the constitutional issue since the facts as proved may remove any constitutional question. Alternatively, a more concrete record will be available on which to decide the constitutional issues. See generally *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 574–575. Even when constitutional principles are not involved, it is important that "the conceptual legal theories be explored and assayed in the light of actual facts, not as a pleader's supposition," so that courts may avoid "elucidating legal responsibilities as to facts which may never be." *Shull* v. *Pilot Life Ins. Co.,* 313 F. 2d 445, 447 (CA5 1963).

claims against the prison doctors have not been disposed of with finality.[8]

The principal beneficiaries of today's decision will not be federal judges, very little of whose time will be saved, but rather the "writ-writers" within the prison walls, whose semiprofessional services will be in greater demand. I have no doubt about the ability of such a semiprofessional to embellish this pleading with conclusory allegations which could be made in all good faith and which would foreclose a dismissal without any response from the State. It is unfortunate that today's decision will increase prisoners' dependence on those writ-writers. See *Cruz* v. *Beto*, 405 U. S. 319, 327 n. 7 (REHNQUIST, J., dissenting).

## II

Like the District Court's decision to dismiss the complaint, this Court's decision to hear this case, in violation of its normal practice of denying interlocutory review, see

[8] In an affidavit filed in the Court of Appeals, Gamble states that he has been transferred to another prison, placed in solitary confinement, and denied any medical care at all. These conditions allegedly were continuing on December 3, 1974, the date of the affidavit. The Court of Appeals apparently considered these allegations, as shown by a reference to "the fact that [Gamble] has spent months in solitary confinement without medical care and stands a good chance of remaining that way without intervention," 516 F. 2d, at 941. Presumably the Court's remand does not bar Gamble from pursuing these charges, if necessary through filing a new complaint or formal amendment of the present complaint. The original complaint also alleged that prison officials failed to comply with a doctor's order to move Gamble to a lower bunk, that they put him in solitary confinement when he claimed to be physically unable to work, and that they refused to allow him to see a doctor for two days while he was in solitary. Gamble's medical condition is relevant to all these allegations. It is therefore probable that the medical records will be produced and that testimony will be elicited about Gamble's medical care. If the evidence should show that he in fact sustained a serious injury and received only *pro forma* care, he would surely be allowed to amend his pleading to reassert a claim against one or more of the prison doctors.

R. Stern & E. Gressman, Supreme Court Practice 180 (4th ed. 1969), ill serves the interest of judicial economy.

Frankly, I was, and still am, puzzled by the Court's decision to grant certiorari.[9] If the Court merely thought the Fifth Circuit misapplied *Haines* v. *Kerner* by reading the complaint too liberally, the grant of certiorari is inexplicable. On the other hand, if the Court thought that instead of a pleading question, the case presented an important constitutional question about the State's duty to provide medical care to prisoners, the crude allegations of this complaint do not provide the kind of factual basis[10] the Court normally requires as a predicate for the adjudication of a novel and serious constitutional issue, see, *e. g., Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–575; *Ellis* v. *Dixon,* 349 U. S. 458, 464; *Wainwright* v. *City of New Orleans,* 392 U. S. 598 (Harlan, J., concurring).[11] Moreover, as the Court notes, all the Courts of Appeals to consider the question have reached substantially the same conclusion that the Court adopts. *Ante,* at 106 n. 14. Since the Court seldom takes a case merely to reaffirm settled law, I fail to understand why it has chosen to make this case an exception to its normal practice.

---

[9] "The only remarkable thing about this case is its presence in this Court. For the case involves no more than the application of well-settled principles to a familiar situation, and has little significance except for the respondent. Why certiorari was granted is a mystery to me—particularly at a time when the Court is thought by many to be burdened by too heavy a caseload." *Butz* v. *Glover Livestock Comm'n Co.,* 411 U. S. 182, 189 (STEWART, J., dissenting).

[10] As this Court notes, *ante,* at 100 n. 5, even the meaning of some of the terms used in the complaint is unclear.

[11] If this was the reason for granting certiorari, the writ should have been dismissed as improvidently granted when it became clear at oral argument that the parties agreed on the constitutional standard and disagreed only as to its application to the allegations of this particular complaint. See Tr. of Oral Arg. 38, 48.

## III

By its reference to the accidental character of the first unsuccessful attempt to electrocute the prisoner in *Louisiana ex rel. Francis* v. *Resweber*, 329 U. S. 459, see *ante*, at 105, and by its repeated references to "deliberate indifference" and the "intentional" denial of adequate medical care, I believe the Court improperly attaches significance to the subjective motivation of the defendant as a criterion for determining whether cruel and unusual punishment has been inflicted.[12] Subjective motivation may well determine what, if any, remedy is appropriate against a particular defendant. However, whether the constitutional standard has been violated should turn on the character of the punishment rather than the motivation of the individual who inflicted it.[13] Whether the conditions in Andersonville were the

---

[12] As the four dissenting Justices in *Resweber* pointed out:

"The intent of the executioner cannot lessen the torture or excuse the result. It was the statutory duty of the state officials to make sure that there was no failure." 329 U. S., at 477 (Burton, J., joined by Douglas, Murphy, and Rutledge, JJ.).

[13] The Court indicates the Eighth Amendment is violated "by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Ante*, at 104–105. If this is meant to indicate that intent is a necessary part of an Eighth Amendment violation, I disagree. If a State elects to impose imprisonment as a punishment for crime, I believe it has an obligation to provide the persons in its custody with a health care system which meets minimal standards of adequacy. As a part of that basic obligation, the State and its agents have an affirmative duty to provide reasonable access to medical care, to provide competent, diligent medical personnel, and to ensure that prescribed care is in fact delivered. For denial of medical care is surely not part of the punishment which civilized nations may impose for crime.

Of course, not every instance of improper health care violates the Eighth Amendment. Like the rest of us, prisoners must take the risk that a competent, diligent physician will make an error. Such an error may give rise to a tort claim but not necessarily to a constitutional claim. But when the State adds to this risk, as by providing a physician who

product of design, negligence, or mere poverty, they were cruel and inhuman.

In sum, I remain convinced that the petition for certiorari should have been denied. It having been granted, I would affirm the judgment of the Court of Appeals.

---

does not meet minimum standards of competence or diligence or who cannot give adequate care because of an excessive caseload or inadequate facilities, then the prisoner may suffer from a breach of the State's constitutional duty.