REVISED APRIL 9, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-11078
_____

BRENT LAWSON,

Plaintiff - Appellee,

v.

DALLAS COUNTY; JIM BOWLES,
in his official capacity as Dallas County Sheriff;
JAMES R. FARRIS, in his official capacity as
Dallas County Chief Medical Officer,

Defendants - Appellants.

_____

Appeal from the United States District Court for the
Northern District of Texas, Dallas Division

_____

March 28, 2002

Before GARWOOD, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

We withdraw our prior opinion in this case, and substitute the following. This appeal arises

out of inmate Brent Lawson's claims that the acts and omissions of jail medical personnel caused him

to develop severe decubitus ulcers on his lower back and buttocks. After a bench trial, the district

judge entered a judgment for Lawson in the amount of $250,000. The questions presented are: (1)

1

whether the district court's factual findings were clearly erroneous; (2) whether the district court erred in concluding, based on the factual findings, that the defendants violated Lawson's Eighth Amendment right to adequate medical care; and (3) whether Dallas County should be held liable for these violations.

I

We review a district court's findings of fact for clear error. Crawford v. Falcon Drilling Co., Inc., 131 F.3d 1120, 1124 (5th Cir. 1997). The parties do not challenge the district court's factual findings, and we do not find any clear error. Therefore, we base our opinion on the findings of fact by the district court, which we summarize briefly.

Lawson is a paraplegic who is paralyzed from the chest down. He was arrested for a parole violation on September 13, 1993 while in the care of Dr. Benavides at Tri-City Hospital, and was transferred to the Lew Sterrett Justice Center ("the jail"). Lawson was in good health when he entered the jail. However, without proper medical care paraplegics such as Lawson are at risk of developing decubitus ulcers, caused by unrelieved pressure on the body, which can be life-threatening. Various medical equipment and personal assistance used to prevent decubitus ulcers are part of basic medical training for doctors and nurses and are standard medical procedure in caring for paraplegics.

When Lawson left Tri-City for the jail, his doctor, Dr. Benavides, telephoned Dr. Farris, the Dallas County Chief Medical Officer, and expressed his concern that the jail could not adequately care for Lawson. On Lawson's hospital patient transfer form, Dr. Benavides stated that Lawson required range of motion exercises twice per day, turning of his body once per hour, various medications, dressing changes twice per day, and frequent cleaning and diaper changes.

Nurse Pat McCormack, the supervising nurse when Lawson came through intake at the jail,

2

objected to Lawson's detention at the jail because she believed that the jail could not adequately meet his medical needs. However, the Sheriff's Department overruled her decision. During intake, Nurse Diane Lynn was unable to read Dr. Benavides' instructions on the medical transfer form. In accordance with jail policies: Nurse Lynn did not contact Tri-City to clarify the orders, resulting in Lawson's medical orders being improperly recorded; no mobility assessment of Lawson was done; and no alternative placement was considered.

Lawson was placed in an infirmary cell with a bed that had a three-inch mattress lain on top of a cement slab overlaid with ceramic tiles. The mattress often slipped off, and Lawson fell out of bed. On October 2, 1993, after he fell off the bed he called out to the officer on duty for assistance, who refused to help him. Lawson filed a grievance which the Lew Sterrett Tower Division rejected, noting that generally inmates had to assist each other in moving from beds to wheelchairs.

On November 3, Dr. John Kimmons, a doctor at the jail, saw Lawson and diagnosed him with Stage II decubitus ulcers, a break in the outer skin that requires immediate attention because the tissue has begun to rot and die. Dr. Kimmons recorded this diagnosis in Lawson's jail medical records and ordered the jail nurses to perform wet-to-dry dressing changes three times per day. The nurses did not follow these orders, however, because the jail policy was to provide dressing changes only twice per day. Lawson sometimes did not receive dressing changes this often if he did not make it to the door of the cell in time, as required by jail policy.

On November 6, Nurse Lynn transferred Lawson to a solitary cell because other inmates had begun to complain about his stench of urine and feces. The solitary cell had no mobility supports, and on several occasions Lawson fell to the floor and lay there for extended periods. The district court found that by this time the jail nurses and doctors were aware of Lawson's ulcers, but jail policy

prevented them from doing anything more than changing his dressings twice daily and giving him medications.

Nurses saw Lawson on November 3, 5, 6, and 8. On November 8, Dr. Kimmons diagnosed Lawson with two large decubitus ulcers, noting that they had worsened since November 3 and were now at least Stage III. The jail staff scheduled an appointment for Lawson at Parkland Hospital on December 28, about fifty days later. Lawson received no dressing changes for the following nine days. The jail medical records indicate that Lawson "refused" dressing changes, but the district court found this characterization to be suspect because the medical staff considered an inmate's physical failure to arrive at the cell door for a dressing change a "refusal."

On November 13, the jail medical staff sent Lawson to Parkland for a urinary tract infection. The Parkland doctors diagnosed Lawson with Stage III and IV decubitus ulcers. Lawson was returned to the jail with "medically necessary" orders calling for wet-to-dry dressing changes three times per day, turning every two hours, and use of a pressure-reducing mattress, which Parkland supplied. The jail medical staff did not follow the instructions because they contravened jail policies. Also pursuant to jail policy, the nurses did not advise Parkland they could not follow these orders or seek alternative placement for Lawson.

Lawson was returned to Parkland on November 19, 1993, because the ulcers on his hips and buttocks had worsened rapidly. Parkland returned Lawson to the jail the same day, with mandatory medical orders that mirror those of November 13. The jail medical staff did not provide the prescribed treatments, seek alternative placement for Lawson, or monitor the progression of his wounds. On November 28, 1993, a member of the jail's medical staff sent Lawson back to Parkland. Parkland diagnosed Lawson with three large decubitus ulcers, two of which were Stage IV, exposing

4

dead tissue and bone. Hospital staff concluded that "the patient has not been cared for properly in the interim" between visits to Parkland. On November 30, Parkland physician Dr. J. Donald Smiley determined that the jail could not effectively treat Lawson and refused to release Lawson back to the jail.

On January 8, 1994, Lawson was transferred to the custody of the Texas Department of Corrections, and then to the John Sealy Hospital in Galveston. Over the next six months, Lawson underwent two surgical debridements to remove dead tissue in the ulcer regions and treat the osteomyelitis that had developed as a result of the ulcers. He also underwent three flap surgeries to attempt to close the holes exposing his left and right trochanter bones. Lawson suffered extensive scarring and disfigurement over his lower back and buttocks regions, as well as severe mental anguish and physical and emotional pain. Following each of these surgeries, Lawson was confined to his bed for weeks. Lawson underwent another surgery on May 1, 1995. Lawson still suffers from chronic pain in his hip and lower back regions. No pain relief measure has been effective.

On November 11, 1995, Lawson filed this lawsuit against Dallas County, Jim Bowles in his official capacity as Sheriff, and James Farris in his official capacity as Chief Medical Officer of the Dallas County Jail, alleging that defendants were liable under 42 U.S.C. § 1983 for violating Lawson's right to adequate medical care under the Eighth Amendment. After a bench trial, the district court entered judgment for the plaintiff and awarded him $250,000 for past and future pain and suffering and mental anguish. Defendants now appeal.

II

The defendants first argue that the district court erred in finding that any of the jail officials violated Lawson's right to adequate medical care under the Eighth Amendment. We review the

5

district court's conclusions of law on this issue de novo. Ran-Nan Inc. v. General Acc. Ins. Co. of America, 252 F.3d 738, 739 (5th Cir. 2001). Although the defendants argue that they provided adequate medical care under the circumstances and that their policies were reasonable, there is sufficient evidence to the contrary that would support the district court's findings.

The Eighth Amendment prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners. Estelle v. Gamble, 429 U.S. 97, 104 (1976). The plaintiff must prove objectively that he was exposed to a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Additionally, the plaintiff must show that jail officials acted or failed to act with deliberate indifference to that risk. Id. at 834. The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it. Id. at 837, 839.

The district court found that it is common medical knowledge that a paraplegic who is not properly cared for is at substantial risk of developing serious, even life-threatening, decubitus ulcers. This is not in dispute. However, the defendants contend that the district court improperly applied the Farmer deliberate indifference test to the collective knowledge and collective response of the jail medical staff as a whole, rather than focusing on specific employees. To apply the Farmer test, each individual's subjective deliberate indifference must be examined separately. See Stewart v. Murphy, 174 F.3d 530, 537 (5th Cir. 1999). It is clear from reading the opinion that the district court believed that all the nurses who primarily treated Lawson, including Nurses McCormack and Lynn, had actual knowledge of the risk posed by the development and worsening of Lawson's ulcers. The nurses changed Lawson's dressings on several occasions and must have observed first-hand the large holes developing in Lawson's skin. The jail medical staff were aware of pressure sores on Lawson's back

6

as early as November 6, 1993. Moreover, the district court found that "[e]ach time Mr. Lawson was sent to Parkland . . . the jail [was] put on notice that it was providing inadequate care for him." Reading the district court's opinion as a whole, then, it is apparent that the district court found that the nurses who treated Lawson, including McCormack and Lynn, were aware of the risk of Lawson's condition and responded to it by: disobeying doctor's orders; placing him in a solitary cell; not providing him with adequate mobility equipment; not personally assisting him in turning himself, bathing, or moving; not providing necessary dressing changes; and not seeking alternative placement for Lawson. The district court's findings of fact on this issue are sufficient.

The defendants next argue that these responses do not rise to the level of deliberate indifference. Deliberate indifference requires actual knowledge and conscious disregard of the risk of harm to the plaintiff. Farmer, 511 U.S. at 834. Deliberate indifference cannot be inferred from a prison official's mere failure to act reasonably, i.e., it cannot be inferred from negligence alone. Hare v. City of Corinth, 74 F.3d 633, 649 (5th Cir. 1996) (en banc).

The evidence in this case suppo rts the district court's finding that the medical personnel treating Lawson had actual knowledge of the risk to Lawson's health, but consciously disregarded that risk. The nurses who changed Lawson's dressings saw his ulcers. The doctors at Tri-City and Parkland (on each of three visits), and Dr. Kimmons all agreed that Lawson required dressing changes three times per day and regular medication. Doctors at Tri-City and Parkland sent specific mandatory orders to the jail medical staff to turn Lawson every one or two hours, provide Lawson with a foam mattress, and conduct hydrotherapy. The jail nurses did not follow these instructions, despite their actual knowledge of the seriousness of Lawson's condition. The district court's findings that the jail medical staff exhibited deliberate indifference to Lawson's serious medical needs, on these facts, are

7

not defective as a matter of law.

III

The defendants next argue that the district court erred in finding that Dallas County ("the County") was liable for any violation of Lawson's constitutional rights. A municipality is liable under § 1983 only if three requirements are met. First, the municipality must have "an official policy, practice, or custom" which could subject it to § 1983 liability. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-94 (1996). Second, the official policy must be linked to the constitutional violation. Id. Finally, the official policy must reflect the municipality's deliberate indifference to that injury. Hare, 74 F.3d at 649 n. 4, citing Farmer, 511 U.S. at 841. The evidence here was sufficient to show that the County's policies were linked to the deprivation of Lawson's Eighth Amendment rights and that the policies reflected the county's deliberate indifference.

The defendants argue that there was no "official policy" at work in Lawson's case because the County had never before received a complaint like Lawson's from a paraplegic. This argument is without merit. An "official policy" for § 1983 purposes may be either a written policy or "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). The defendants do not dispute that the practices at issue in this case were consistently applied to paraplegic inmates. The failure of anyone else to complain would not seem to undermine the existence of a policy. Nevertheless, the district court discredited the County's assertion that it had never had any other complaints from paraplegic inmates.

Secondly, there must be evidence establishing a direct causal link between the official policy

8

and the constitutional violation. The policy must be the "moving force" behind the constitutional violations. Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). In this case, the district court found that the following official policies restricted the nurses' ability to care for Lawson: initial health and mobility assessments for paraplegics are not routine; dressing changes are allowed only twice per day, and diaper changes and showers must also be completed during this time; nurses are not allowed to enter a prisoner's cell except, if at all, under limited circumstances; nurses are not allowed to help inmates in the shower; foam mattresses are not allowed; mobility supports are not provided; hospital policies that conflict with jail policies are disregarded; and alternative placements for paraplegics are not considered. Had these policies not been in effect, it is reasonable to expect that Lawson would have received much more personal assistance from the nurses at the jail. For example, the nurses who treated Lawson pointed to these jail policies to explain why they did not follow Parkland's orders. The district court did not err in finding that the County's policies were the "moving force" behind any constitutional violation.

Finally, the municipality must maintain its official policy with deliberate indifference to a constitutionally protected right. Unlike the deliberate indifference standard applied to individual employees, this standard is an objective one; it considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights. Farmer, 511 U.S. at 841; Hare, 74 F.3d at 643 n. 4. Therefore, constructive notice is adequate. Id.

Although the defendants contend they could not have known that a constitutional violation would occur in this case because they have never before received a report similar to Lawson's, the district court did not credit this assertion, because it was made by the same people who had no

9

memory of Lawson's condition even though some had personally interacted with him. The district court found that the jail's medical records could not be credited to support the defendants' assertion because Lawson's own medical records did not reflect the severity of his condition. The orders from doctors at Tri-City and Parkland and Dr. Benavides' personal conversation with Dr. Farris, the Dallas County medical officer, support the finding that the County should have been aware of the danger its policies posed to Lawson. Lawson's own official complaint made to the jail authorities also indicates that the County had constructive knowledge of Lawson's inability to care for himself. The district court's finding, on these facts, is not reversible as a matter of law.

IV

For the reasons discussed above, the judgment of the district court is

AFFIRMED.

10