Bruce N. BIEBER, Plaintiff–Appellant,

v.

WISCONSIN DEPARTMENT OF CORRECTIONS, et al., Defendants–Appellees.

No. 02–2713.

United States Court of Appeals, Seventh Circuit.

Submitted April 1, 2003.*

Decided April 7, 2003.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before FAIRCHILD, BAUER, and KANNE, Circuit Judges.

ORDER

Proceeding pro se, inmate Bruce Bieber contends in this action under 42 U.S.C. § 1983 that the Wisconsin Department of Corrections, Secretary Jon Litscher, Dr. Gert Hasselhof, Nurse Pam Bartels, and Security Director Gary Boughton denied him constitutionally adequate medical care by refusing to allow him to wear a knee brace in prison and by delaying surgery on his knee. Bieber also claims that two prison guards–Officers W. Brown and T. Belz–in one instance used excessive force to restrain him. The district court resolved each of the claims in favor of the defendants, and Bieber appeals.

In August 2000 Bieber injured his knee when police arrested him for assaulting a public bus driver in Milwaukee. An MRI taken the following April revealed a torn anterior cruciate ligament and degeneration of the lateral meniscus, so Milwaukee physicians prescribed a rigid brace for stability and allegedly recommended that Bieber have surgery to repair the injury. In the meantime Bieber was convicted on charges stemming from his assault on the bus driver, and in June 2001 he began serving a five-year term at Dodge Correctional Institute.

In July Bieber began filing grievances demanding physical therapy and surgery for his knee. The grievances were denied because prison medical personnel—upon obtaining his MRI results from Milwaukee—scheduled Bieber for an evaluation at the orthopedic clinic associated with the University of Wisconsin Hospital. The soonest available appointment was in October, and until then prison physicians prescribed pain medication. Bieber meanwhile had gotten into a fight at Dodge, and officials in September transferred him to Supermax Correctional Institution.

When Bieber transferred to Supermax, he promptly was screened at the prison's health services unit and examined by Dr. Hasselhof. Dr. Hasselhof noted that Bieber had complained of knee pain and that

he would "follow up" to see if Bieber had been scheduled for surgery. The prison's medical director, Nurse Bartels, also telephoned Security Director Boughton to see if Bieber could wear the rigid knee brace that he had been given in Milwaukee and had brought along during the transfer. Boughton responded that the brace posed a security risk because it contained metal and so could be fashioned into a weapon. Boughton, according to the averments in his affidavit, then asked Nurse Bartels about alternatives to the brace, and she replied that an elastic sleeve would be "medically acceptable" and "serve the same purpose."

In October the sleeve was ordered, and Bieber visited the orthopedic clinic at the University of Wisconsin Hospital as scheduled. There an orthopedic surgeon, Dr. James Keene, reported that Bieber complained of constant pain and "catching" and "shifting" in his knee. Dr. Keene also noted that Bieber was not allowed to wear his brace in prison, but he did not suggest that the restriction was medically unacceptable. Nor did Dr. Keene recommend surgery immediately. He instead concluded that Bieber would be a surgical candidate only after he completed a course of physical therapy, reduced his current pain medications (to ensure that he did not become resistant to drugs used to manage postoperative pain), and supplied a copy of his MRI to the clinic (presumably so that doctors could further assess the damage to his knee). The prison's medical staff accordingly arranged physical therapy and prescribed analgesic balm in lieu of the narcotics that Bieber had been taking. According to a note in Bieber's medical file, the staff also "worked on getting the MRI pictures sent."

Then, on November 27, Bieber had an altercation with Officers Brown and Belz, as a result of which Bieber suffered a broken wrist and aggravated his existing knee injury. According to the allegations in Bieber's sworn complaint, the officers took him to be searched in a "strip cell," and when he refused to kneel (on account of his bad knee), Brown slammed him into the cell door, Belz yanked his leg irons into the air, and as Bieber was falling to the ground, Brown jumped on him and applied a choke-hold. Following the alleged assault, medical staff administered Valium, applied ice, splinted Bieber's right forearm and knee, and arranged for him to be taken to the University of Wisconsin Hospital. At the hospital doctors placed a cast on Bieber's wrist but found no new instability in his knee.

Bieber returned to the prison the following day in a wheelchair, which Nurse Bartels did not allow Bieber to use in the prison because she apparently believed that Bieber did not need the device for ambulation. The medical staff, however, did issue an order to the guards that Bieber could not kneel, cross his legs, or bend his left knee. The staff also sent Bieber back to the hospital for a scheduled check of his wrist and continued sending him for scheduled physical therapy on his knee. But on December 28 the physical therapist determined that further therapy was unwarranted. The therapist reported that conservative treatment had "reached maximum benefit" and that Bieber "may benefit" from surgery. The therapist also noted that if Bieber could not wear his rigid knee brace in prison for security reasons, then his current "functional deficits" would not improve.

Over the next two months the medical staff twice scheduled Bieber to return to the orthopedic clinic, but the clinic cancelled both appointments and rescheduled him for April 12. After that visit the attending physician, Dr. Smith, reiterated that Bieber appeared to have a torn ante-

rior cruciate ligament. To treat the injury, he recommended that Bieber wear his rigid knee brace "at all times," that the prison either obtain Bieber's MRI or arrange to have a new MRI performed, and that Bieber return to the clinic when the MRI had been obtained. According to Bieber, the medical staff to this day has not obtained his MRI or otherwise complied with these instructions.

Meanwhile, Bieber had been filing grievances complaining that the medical staff had "confiscated" his knee brace and unnecessarily delayed surgery for his knee. He also charged that Officers Brown and Belz had used excessive force to restrain him in the strip cell. After unsuccessfully appealing each grievance to Secretary Litscher (the head of the Department of Corrections), Bieber brought this action. The district court promptly dismissed Bieber's claims against the department as barred by the Eleventh Amendment but permitted him to proceed as to the remaining defendants. Bieber then asked the court to enlist counsel to help him obtain evidence that would support his claims. He also filed a "Discovery Motion," requesting that the district court order the defendants to produce his knee brace, dozens of records from his prison medical file, and two videotapes allegedly made on November 27 by security cameras mounted in the strip cell.

The district court denied Bieber's request for counsel because he had not attempted to secure private counsel and because the case appeared factually and legally straightforward. The judge, however, did not rule on Bieber's discovery motion. Then upon the defendants' motions, the court granted summary judgment on Bieber's medical-care claims, concluding that Bieber had not established a genuine issue whether he had an objectively serious medical condition or whether the authorities acted with deliberate indifference to that condition. But with respect to Bieber's excessive-force claims, the court determined that there was a triable question whether Brown and Belz used force for the sole purpose of causing harm to Bieber. So after quashing subpoenas sent by Bieber to various doctors and prison staff, the court held a jury trial on June 14. The jury returned a special verdict finding that Brown and Belz had not used excessive force.

On appeal Bieber offers no reason to think that the district court improperly dismissed the Department of Corrections. Nor does he explain how Secretary Litscher was personally involved in any constitutional wrongdoing. *Boyce v. Moore,* 314 F.3d 884, 888 (7th Cir.2002). Bieber's principal contentions instead concern the grant of summary judgment on his medical-care claims against Security Director Boughton, Dr. Hasselhof, and Nurse Bartels, as well as the district court's handling of his request for counsel and motion for discovery. These arguments are considered in turn.

To avoid summary judgment on his medical-care claims, Bieber had to present evidence that prison officials acted with deliberate indifference toward his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). He therefore needed to show that he had an objectively serious medical condition and that prison officials knew of a risk posed by the condition and disregarded that risk. *Farmer v. Brennan,* 511 U.S. 825, 834–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Although the district court concluded that Bieber had not presented sufficient evidence to withstand summary judgment on either the objective or subjective prongs of this test, we think that with respect to the objective prong, at

least, he did enough. The record reflects that without his rigid brace Bieber's injured knee caused him significant pain, and that by itself raises a triable question whether he had an objectively serious medical condition. *Walker v. Benjamin,* 293 F.3d 1030, 1039–40 (7th Cir.2002) (discussing cases involving serious pain).

As for the subjective prong, Bieber contends that he made the necessary showing in two ways. First, Bieber says that the medical staff knew of and disregarded the risk that his knee injury would worsen by refusing to allow him to wear his knee brace. Bieber's theory is that doctors outside the prison system prescribed this device and the prison's staff deliberately ignored those orders. *See, e.g., Murphy v. Walker,* 51 F.3d 714, 720 (7th Cir.1995) (removing a cast without a doctor's approval states a claim for deliberate indifference); *Lawson v. Dallas County,* 286 F.3d 257, 263 (5th Cir.2002) (jail nurses acted with deliberate indifference by ignoring doctor's orders).

■ The problem is that Bieber has not supplied evidence that either Security Director Boughton, Dr. Hasselhof, or Nurse Bartels believed that the brace was essential to treat his injury. The prison's medical staff plainly knew that Bieber's knee, if left unsupported, jeopardized his physical well-being. The staff, however, gave Bieber an elastic sleeve as a substitute for the brace because they believed that metal in the brace posed a security risk. It may be that the sleeve was inadequate–as Bieber's physical therapist suggested in December and as Dr. Smith reiterated in April. Yet absent evidence that the defendants were aware of the inadequacy, Bieber has no claim. At most he has shown a difference of medical opinion, which raises questions under tort law but not the Constitution. *Snipes v. DeTella,* 95 F.3d 586, 591 (7th

Cir.1996); *see also Walker v. Peters,* 233 F.3d 494, 501 (7th Cir.2000).

■ Bieber's second theory is that prison officials have deliberately ignored his condition by delaying surgery for his knee. Specifically, Bieber contends that the defendants have canceled his appointments with the orthopedic clinic and failed to obtain copies of his MRI. A delay in necessary treatment can establish deliberate indifference, but only if "verifying medical evidence" exists to show how the delay adversely affected a patient's condition. *Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir.1996) (emphasis and internal quotation omitted). Here, however, it is not even clear that the prison's medical staff was responsible for any delays. After all, it was the *clinic* that canceled Bieber's two appointments. And even if the prison has held up surgery (by failing, for example, to obtain the MRI results), Bieber has not introduced medical evidence to show the effect—if any—of the delay on his condition. Without such evidence, Bieber could not overcome summary judgment on his medical-care claims.

Turning to the excessive-force claims, Bieber does not argue that the jury verdict was unsupported by the evidence. Nor could he make such an argument, for he has not included a complete transcript of the trial as part of the record on appeal. Fed. R.App. P. 10(b)(2); *see LaFollette v. Savage,* 63 F.3d 540, 544 (7th Cir.1995). Bieber's objection instead is that the district court forced him to try the case without a lawyer and thus denied him "effective assistance of counsel." There is of course no right to effective legal assistance in civil cases. *See, e.g., Stanciel v. Gramley,* 267 F.3d 575, 581 (7th Cir.2001). But what Bieber apparently means is that the district court denied him a fair trial by refusing to recruit an attorney to help him

conduct discovery and by ignoring his own "Discovery Motion."

■ Neither objection has merit. With respect to his motion to enlist counsel, Bieber has offered no evidence that he adequately tried to obtain private counsel or that circumstances prevented his doing so, so the district court did not abuse its discretion by denying the request. *Zarnes v. Rhodes,* 64 F.3d 285, 288 (7th Cir.1995); *Jackson v. County of McLean,* 953 F.2d 1070, 1072–73 (7th Cir.1992). Bieber says that his efforts somehow were "sabotaged" by Supermax employees. But he does not elaborate on this contention or provide any evidence for the charge, and without a developed argument the point is waived. Fed. R.App. P. 28(a)(9); *see Anderson v. Hardman,* 241 F.3d 544, 545 (7th Cir. 2001).

■ That leaves Bieber's argument that the district court improperly ignored his discovery motion. To obtain discovery, Bieber needed to serve his requests on the defendants, which he allegedly did. Then if the defendants refused to produce the requested materials, he needed to file– after appropriate notice–a motion to compel under Federal Rule of Civil Procedure 37(a). Bieber did not take this final step. Nor did he file an affidavit in support of a request for additional time to respond to the defendants' summary judgment motions. Fed.R.Civ.P. 56(f); *DiCesare v. Stuart,* 12 F.3d 973, 979 (10th Cir.1993) (holding that unrepresented litigants have an obligation to seek extensions under Rule 56(f)). Given that pro se plaintiffs, like counseled litigants, must follow clear procedural rules, *McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *Gleash v. Yuswak,* 308 F.3d 758, 761 (7th Cir.2002), we do not think that the district court's handling of

Bieber's discovery request provides a ground for reversal.

AFFIRMED.