POLITZ, Circuit Judge,
dissenting:
In the majority’s view, Stewart’s death was, at worst, the product of mere negligence. If these appellees are guilty of nothing more than a bit of innocuous medical malpractice, then the barrier to a deliberate indifference claim has been rendered virtually impenetrable. I respectfully dissent, as I cannot subscribe to the majority’s view of the eighth amendment, effectively rendering its vaunted protections an empty promise.
As an unsariitized and uncontested view of the evidence fully demonstrates, appel-lees—starkly aware of Stewart’s dire condition—denied him treatment that could have saved his life. Without providing even the most rudimentary of medicinal functions,[1] appellees averted their heads as Stewart slowly and painfully died.
There is no question but that Stewart suffered from ill health when he was incarcerated in 1993, and that his health worsened throughout 1994. But it was after a stay in the prison hospital, where he was neither moved nor bathed during a five-day period, that his condition drastically deteriorated. Through what one physician has called “a total lack of observation,”[2] Dr. Dial, Stewart’s treating physician, overlooked Stewart’s skin wounds. Though the nurses’ notes clearly stated that Stewart was unable to move and was incontinent of bowel and bladder, he was nonetheless released from the hospital. Dr. Dial did not examine Stewart on the days the nurses made these notations;' nor did he review their notes before discharging Stewart. The day after Stewart left the hospital, Dr. Dial received notification that Stewart had developed a twenty-five centimeter stage IV decubitus ulcer—an advanced-stage bed sore caused by extended periods of immobility—with necrosis over 95% of its area. Dr. Dial prescribed a treatment of cleansing, dressing, and antibiotics, but he never bothered to confirm that his orders were followed or to check to see whether the treatment was effective.
*539 When Stewart was returned to his prison unit, he gave off a foul body odor and feared taking a bath. Because the wheelchair-bound Stewart could not bathe himself, he was forced to rely on his cell-mate who saw that both sides of Stewart’s hips were bloody and raw and that his clothes stuck to his body. Although Stewart’s cell-mate attempted to clean the wounds, Stewart’s wounds — which emitted a fetid smell and from which there was substantial drainage — worsened. Stewart became feverish and delirious, lost the ability to control both his bladder and his bowel functions, and urinated and defecated on himself. Throughout this period, no physician saw Stewart. The cell-mate signed Stewart in for sick call a number of times but he was not then examined by any medical personnel.
After the passage of two weeks Stewart finally was admitted to the prison hospital by Dr. Kim. On admission, Dr. Kim noted that Stewart had developed multiple decu-bitus ulcers, including a large ulcer with necrotic tissue on his buttocks and one on his foot. Examination of the ulcers revealed a “very deep infection” and cultures from the ulcers indicated contamination by urine or feces. Dr. Kim ordered that Stewart’s dressings be cleaned and changed frequently and that he be repositioned every few hours. But, as Dr. Kim was fully aware, chronic medical under-staffing rendered it extremely improbable that Stewart would receive anything like the treatment medically deemed necessary.[3] The dilemma brought on by the dearth of staff was exacerbated because the nurses avoided treating Stewart, whose putrid infections disgusted them. Non-medical personnel drew the task of cleaning and dressing Stewart’s wounds to the extent that such occurred.
The necrotic tissue quantity so worsened that Dr. Kim consulted a local surgeon, Dr. Wright, who stressed the need for intensive and vigorous physical therapy. This advice was disregarded.[4] Fully aware that the prison hospital lacked the personnel and facilities to implement Dr. Wright’s recommendation, Dr. Kim made no effort whatsoever to transfer Stewart to a facility where he could have received this essential care.[5]
Instead, Dr. Kim referred Stewart to the care of another prison physician, Dr. Knutson, who continued the same regimen already proven to be totally inadequate to arrest Stewart’s deepening infection. At this stage, Dr. Knutson was fully aware that Stewart was arthritic, incontinent, and bed-ridden; his longstanding decubi-tus ulcers had alarmingly worsened; and he could no longer feed himself. The nurses’ notes charted amber, foul-smelling urine and yellow, foul-smelling pus that discharged from Stewart’s penis and gathered around Stewart’s catheter. Subsequently, the notes alerted, Stewart’s bladder became hard and turgid, and his urine became thick and cloudy. The notes also documented repeated complaints by Stewart of a sore throat and widespread pain. According to the notes Stewart, who appeared confused, was moaning and crying. Like Dr. Dial, Dr. Knutson failed to review the nurses’ notes.
*540 Dr. Knutson thereafter left on a four-day Thanksgiving holiday, during which neither he nor any other physician saw Stewart. When Dr. Knutson returned he observed that Stewart “appeared like he was going to die.” While conceding that he believed Stewart had a serious urinary tract infection,[6] Dr. Knutson inexplicably failed to prescribe any antibiotics. Stewart was dehydrated and was not eating; he had become nonresponsive and had multiple abnormalities in lab values. Nonetheless, Dr. Knutson decided against an immediate transfer and delayed two days before transferring Stewart to a proper, readily-available facility. In the meantime, Dr. Knutson took no blood samples to determine Stewart’s nutrition levels and took no cultures to ascertain the extent of his infection. Stewart was grossly malnourished and the infection was severe.
The treating physician at the transferee facility, Dr. Schlessinger, described Stewart’s condition on arrival thusly:
He was very debilitated. He would open his eyes, but he did not respond to commands ... He was very dehydrated .... I think ... the most stunning thing was that he was very dry and that he had huge decubitus ulcers.... I have lots of patients — the reason I remember Mr. Stewart so distinctly is that I would say that he had the sad distinction of probably having the worse decubitus ulcers that I had ever seen in my life. He had pressure sores with breakdowns.... [0]ne of the hips ... was really dramatic. You could see exposed bone, lots of necrotic tissue. [The sores] were horrendously foul smelling.
Approximately one week after he was admitted Stewart died from sepsis, a toxic condition resulting from infection.
The undisputed facts reveal a sad truth. For over three months Stewart lived in agonizing discomfort and pain, slowly approaching death. At least three different physicians could have prevented this painful death by administering a relatively simple course of treatment — antibiotics and physical therapy. Instead, they looked away as Stewart literally rotted away, his flesh decaying, his body soaked in his own feces, urine, blood, and pus. Even at the final stage, when Stewart’s death appeared imminent, a conscious decision was made to postpone his transfer to a hospital for two possibly crucial days.
Despite all of this; the majority dismisses the claim that Stewart’s prison physicians were deliberately indifferent to his serious medical needs based on appellants’ purported failure to show that “the doctors denied, substantially delayed, or intentionally interfered with Stewart’s treatment.”[7] In my judgment, this finding ignores reality. Dr. Schlessinger testified that Stewart’s physicians should have prescribed antibiotics and that they should have ordered an aggressive regime of physical therapy. After fully reviewing Stewart’s medical records, appellants’ medical expert — Dr. Rothschild, Head of the Genetics and Geriatrics Department at the Louisiana State University Medical Center in New Orleans — agreed with Dr. Schlessinger’s conclusion that the care Stewart received fell below the acceptable standard of treatment.[8] Dr. Rothschild *541 could find no evidence that Stewart ever received appropriate treatment “necessary to deal with his life-threatening condition.”[9] According to Dr. Rothschild, Dr. Dial overlooked Stewart’s condition and released Stewart — -an enervated, seriously ailing man — from the hospital only through a “total lack of observation.” Further, as Dr. Rothschild observed, hospital records reflect an acknowledgment by Dr. Kim “that Mr. Stewart cannot be adequately treated at this facility because there are simply not enough personnel to provide the intensive care necessary to treat him.” [10] The same records note that Stewart’s condition was “severe.” A review of Stewart’s medical files left Dr. Rothschild unable to reconcile “[t]he urgency of the need for adequate care ... with the apparent lack of available ... staff ... to carry out the [.physician’s] orders.” Referring to Dr. Knutson’s failure to prescribe antibiotics — despite evidence of a urological infection of which he was aware — Dr. Rothschild remarked upon the lack of any “indication of proper ... management of this condition.” The failure to transfer a dying Stewart out of the prison hospital, Dr. Rothschild suggested, led to his death.[11]
In the face of this evidence, I cannot understand the majority’s conclusion that appellants failed to show knowledge on the part of each physician “that his [or her] acts or omissions subjected Stewart to an excessive risk of harm.”[12] What the record abundantly shows is a failure to undertake even the most basic examination and treatment of a gravely ill patient before releasing him from the prison hospital; a failure to transfer him with full awareness that the prison’s facility lacked the means to care for him; and a failure to prescribe sorely needed antibiotics. To me it appears painfully apparent: if a physician knows that a patient will not receive adequate care unless he is transferred, but fails to transfer him to another facility, that physician knows the patient will not receive adequate care. Analogous statements can. be made of the physicians’ failure to examine and to prescribe antibiotics to a critically ill patient suffering from infection.
The majority brushes aside appellees’ multiple breaches with the simple observa *542 tion that doctors cannot be held accountable for deficiencies in the medical staff. This begs the decisive question whether doctors who know their prison staff is incapable of administering the necessary treatment, may, consistent with the eighth amendment, do nothing while a patient languishes unto death for want of treatment in the prison hospital. In my judgment, a doctor who understands that a patient’s only prospect of survival depends upon a timely transfer, but does not send that patient to an available hospital, cannot escape liability by pointing to failings of the nursing staff. Contrary to the majority’s view, I would not characterize appel-lees’ refusal to transfer Stewart as a mere “difference in opinion as to the appropriate method of treatment under the circumstances.” [13] No physician presumed to suggest that the prison facilities provided a viable alternative course of treatment for advanced decubitus ulcers from which Stewart suffered; paper orders that reasonably cannot be implemented should provide no release from accountability. Nor should the failure to prescribe antibiotics in the face of a raging infection reflect a reasonable alternative medical judgment.
Under Estelle v. Gamble[14] and Farmer v. Brennan[15] a prisoner establishes deliberate indifference by showing that a prison official “kn[e]w[] of and disregarded] an excessive risk to inmate health.” [16] If the facts proven by appellants herein do not satisfy that standard, I am forced to the conclusion that under the majority’s evaluation no factual scenario ever will.
I therefore must dissent.

. The majority insists that, whatever the level of treatment Stewart received, it was more than "rudimentary.” Though the majority understandably dislikes this characterization, the facts speak for themselves.

. See infra at 534.

. See infra at 534. The majority insists that Dr. Kim simply did not understand the severity of the problem. The record does not bear out this convenient inability by a physician to grasp the seriousness of a situation in which her orders cannot be followed.

. Again, the majority quibbles with my terminology. The record reflects that Dr. Kim received Dr. Wright's advice — which she herself had procured — but refused to take any steps to implement his recommendation. She brushed aside his recommendation solely on the ground that Stewart’s condition was not "serious” enough to warrant something as basic as physical therapy.

. The majority faults me for failing to discuss in more detail the treatment Stewart did receive from Dr. Kim. There is no need for me mention that care, as the majority already assigns more weight to that treatment than it can bear — the few affirmative steps Dr. Kim took to treat Stewart were woefully deficient.

. The majority suggests that Dr. Knutson did not know that Stewart was suffering from an infection. His deposition otherwise informs:
Q [Counsel]: So, you think [Stewart has] got a urinary tract infection that’s gonna make him die and you don't give him any antibiotics; is that correct?
A [Dr. Knutson]: Correct.
R. 362.

. Op. at 537.

. The majority dismisses Dr. Rothschild’s affidavit as lacking in probative value because he purportedly failed to review the doctors’ depositions and planned to (but did not) supplement his affidavit upon review of such additional documentation. Perhaps Dr. Rothschild reviewed the depositions but declined to modify the affidavit because his conclusions remained the same. But even if Dr. Rothschild reviewed nothing other than Stewart's medical record, this does not undermine the force of his conclusions for purposes of sum- *541 inary judgment. As a review of his resume confirms, Dr. Rothschild is an impressively qualified physician. The question whether to accept his opinion and the weight to be given to it should be reserved for the jury.

. Contrary to the majority's assertion and as the following discussion reflects, Dr. Rothschild's affidavit clearly identifies acts committed by Stewart’s individual physicians which legally may be classified as "deliberate indifference” — for instance, the affidavit states that "one physician [acknowledged] that Mr. Stewart [could not] be adequately treated at [the prison] facility,” but, despite this acknowledgment, did not transfer Stewart. The fact that Dr. Rothschild does not use the legal term "deliberate indifference” in cataloguing such acts does not mean that he has failed to identify factual situations that legally amount to deliberate indifference.

. The majority points out that Dr. Rothschild’s affidavit referred to an anonymous physician, not Dr. Kim. This is true, but it is clear that Dr. Rothschild must have been referring to Dr. Kim, since she is the only physician who treated Stewart’s decubitus ulcers during the relevant time period and who admitted to an awareness that the prison hospital was not equipped to care for Stewart. If, however, a physician other than Dr. Kim made the statement in the record, that only strengthens my argument — two doctors, not one, expressly recognized that Stewart would not receive the prescribed treatment so long as he was at the prison facility.

. The majority takes issue with this assertion. Dr. Rothschild stated, however, that the care Stewart received "amounts to an indifference on the part of those in authority to take the action necessary to prevent his death, i.e., to evaluate him in a timely manner and transfer him to a facility where he could receive the necessary care.”
I read this statement to mean that in order to prevent Stewart's death, it was necessary for appellees to transfer Stewart to a facility where he could receive appropriate care and treatment.

. Op. at 537.

. Op. at 535.

. 429 U.S. 97, 97 S.Ct 285, 50 L.Ed.2d 251 (1976).

. 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

. Id. at 837, 114 S.Ct. 1970.