# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 06-1534

_____

| | | |
|---|---|---|
| Barbara Alberson, as Special Administrator of the Estate of James Alberson, | * * * * | |
| Appellant, | * * | Appeal from the United States District Court for the Eastern |
| v. | * * | District of Arkansas. |
| Larry Norris, Director of the Arkansas Department of Correction; Correctional Medical Services; Kay Howell, Warden of Wrightsville Unit; John Byus; James Branch, MD; Ella Casady; Betty Leatherwood, | * * * * * * * * | |
| Appellees. | * | |

_____

Submitted: June 14, 2006
Filed: August 15, 2006

_____

Before SMITH, HEANEY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Barbara Alberson, on behalf of her deceased son James Alberson and as special administrator of his estate, appeals an adverse grant of summary judgment on her 42 U.S.C. § 1983 claim. Ms. Alberson alleges that the appellees acted with deliberate

indifference with respect to the medical treatment of Mr. Alberson, who died from complications arising from Goodpasture Syndrome while in the custody of the Arkansas Department of Correction ("ADC"). For the reasons discussed below, we affirm the judgment of the district court.[1]

Mr. Alberson began a twelve-month sentence at the ADC on May 16, 2003 for a driving-while-intoxicated conviction. At all times relevant to this action, Larry Norris was the Director of the ADC; Kay Howell was warden of the Wrightsville Unit of the ADC; John Byus was the Medical Administrator of the ADC; Correctional Medical Services ("CMS") was under contract to provide medical services to the ADC; Dr. James Branch was a physician employed by CMS; and Betty Leatherwood was a registered nurse employed by CMS (collectively, "Appellees").

Mr. Alberson began suffering from earaches before arriving at the Wrightsville Unit on August 11, 2003 and filed numerous medical service requests after his arrival. Between August and October 2003, Mr. Alberson complained of his earaches and other afflictions in letters to Ms. Alberson. Ms. Alberson in turn called Howell approximately thirty times to demand that her son receive medical treatment. Ms. Alberson alleges that Howell told her repeatedly that "there's nothing wrong with your son" and that her son was "a faker and an actor." Ms. Alberson also called Byus in late September 2003 and received a similar response. Nonetheless, Mr. Alberson received treatment by a physician at the Wrightsville Unit Infirmary on six separate dates between August 21 and October 29, including a two-night stay in the infirmary ward. He received multiple rounds of antibiotics and other treatments for ear infections, acid reflux, edema of the legs, bilateral knee pain, erythema and purpuric rash, and hypersensitivity vasculitis.

---

[1]The Honorable William R. Wilson, Jr., United States District Court for the Eastern District of Arkansas.

On November 7, 2003, Mr. Alberson returned to the infirmary with complaints of joint pain, shortness of breath and a sore throat. Dr. Branch made a preliminary diagnosis of streptococcus infection, prescribed new antibiotics and ordered additional diagnostic tests. On November 11, Dr. Branch called Mr. Alberson to the infirmary for a follow-up examination, noted a chronic cough and persistent sore throat and ordered a chest x-ray and a series of laboratory tests. On November 12, when Mr. Alberson's condition failed to improve, he was prescribed a different antibiotic. On November 14, Mr. Alberson produced blood in his cough and was admitted to the infirmary ward. The chest x-ray ordered three days earlier had not yet been performed. When Mr. Alberson's condition had not improved the following morning, Dr. Branch suspected pneumonia and transferred Mr. Alberson to Southwest Hospital in Little Rock, Arkansas. Mr. Alberson lapsed into a vegetative state on November 18 and died the next day.

An autopsy determined Mr. Alberson's cause of death to be pulmonary hemorrhage and renal failure resulting from Goodpasture Syndrome. Goodpasture Syndrome is a rare autoimmune disease that is difficult to diagnose because its symptoms present a "confusing clinical picture." 7 Ausman & Snyder's Medical Library (Lawyers' Edition) § 14:32 (1999). "Patients who survive the initial pulmonary hemorrhage usually progress to end-stage renal failure." *Id.* § 16:16. No definitive therapy exists. *Id.*

Ms. Alberson sued the Appellees under 42 U.S.C. § 1983, alleging that the Appellees were deliberately indifferent to Mr. Alberson's serious medical needs. The district court granted the Appellees' motions for summary judgment because (1) the undisputed evidence of medical treatment provided to Mr. Alberson foreclosed a finding that the Appellees intentionally ignored Mr. Alberson's suffering, and (2) Ms. Alberson did not submit expert evidence to prove a causal connection between the medical treatment provided by the Appellees and Mr. Alberson's death.

We review the district court's grant of summary judgment de novo and examine the facts in the light most favorable to the party opposing summary judgment. *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004). A prison official's deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). The claimant must show that "prison officials actually knew of but deliberately disregarded" the prisoner's objectively serious medical needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). Given the extensive record of medical treatment provided to Mr. Alberson in this case, we agree with the district court that Ms. Alberson's evidence does not support a claim that any prison official deliberately disregarded Mr. Alberson's suffering. Therefore, we analyze Ms. Alberson's claim as one that the medical treatment provided to Mr. Alberson was so inadequate as to rise to the level of deliberate indifference.[2]

---

[2]The dissent contends that certain "gaps" in Mr. Alberson's treatment, in combination with the inappropriate remarks made by prison officials to Ms. Alberson, constitute sufficient evidence to create a jury question as to whether prison officials deliberately disregarded Mr. Alberson's suffering. However, to the extent the dissent may be read to imply that Mr. Alberson developed an ear infection on July 31, 2003 but received no treatment for it until August 29, 2003, we note that Mr. Alberson was examined at the ADC Diagnostic Unit on August 1, 2003, and was prescribed a course of oral medication and ear drops for the ear infection. Notes from that visit also reflect that Mr. Alberson was already taking Zantac twice a day at that time for his heartburn. Mr. Alberson was reexamined on August 17, 2003, and the diagnosis stated, "[H]as allergy problems[;] can't hear out of ear – ears red[,] no swelling[,] some drainage[;] will give ctm and Tylenol." Mr. Alberson was also prescribed further medication for his heartburn at that time. Similarly, to the extent the dissent may be read to imply that Mr. Alberson submitted a medical request on October 15, 2003 but received no treatment until his admittance to the infirmary on October 27, we note that Mr. Alberson was examined on October 17, was prescribed ice and a sling and given a "no work" restriction. In short, the record makes clear that Ms. Alberson's evidence at best challenges the wisdom of the course of treatment provided to Mr. Alberson, and does not suggest a deliberate disregard of his suffering.

To state a claim of inadequate medical treatment for § 1983 purposes, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. The plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation. *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006).

We agree with the district court that Ms. Alberson's claim fails for lack of proof of causation. For instance, in *Robinson v. Hager*, 292 F.3d 560 (8th Cir. 2002), a prisoner suffered a stroke after prison officials failed to provide him with blood pressure medication. We held that "although a person suffering from a stroke may exhibit visible symptoms, the stroke itself is a sophisticated injury which could be caused by numerous factors other than lack of medication. Therefore, expert medical testimony is needed to prove causation." *Id.* at 564.

The instant case is similar. Goodpasture Syndrome certainly qualifies as a sophisticated medical condition. Although Mr. Alberson suffered from visible symptoms, a determination of whether CMS personnel should have provided different treatment for Mr. Alberson or diagnosed his fatal illness earlier, or indeed whether any treatment at all could have alleviated his suffering or arrested the progress of the disease, "is not within the realm of lay understanding." *Id.* (quoting *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1210 (8th Cir. 2000)). Therefore, Ms. Alberson's failure to produce expert testimony to prove that a lack of proper medical treatment caused Mr. Alberson's death is "fatal to [her] deliberate indifference claim as a matter of law." *Id.* Ms. Alberson's evidence that administrators Howell and Byus expressed skepticism about her son's illnesses, while troubling, does not obviate the need for expert proof of causation.

-5-

We conclude that the district court did not err in granting the Appellees' motions for summary judgment based on the absence of expert proof of causation. Accordingly, we affirm.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent in part. There is more than sufficient evidence of the corrections employees' deliberate indifference to James Alberson's ongoing serious health issues to require a trial. Thus, summary judgment was inappropriate and the matter should be remanded. Although the present record does not directly link James's death to the corrections employees' indifference, it clearly shows that he suffered great pain prior to his death because the corrections employees denied him appropriate access to medical treatment.

Corrections officials are obligated, under the Eighth Amendment's prohibition of cruel and unusual punishment, to provide inmates with proper medical care. *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997). To show a constitutional violation, Alberson must show "(1) that [James] suffered objectively serious medical needs and (2) that the prison officials knew of but deliberately disregarded those needs." *Id.* at 1239. "Whether a prison official had the requisite knowledge of substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. . ., and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The corrections employees' actions and "callous comments" illustrate a culture of deliberate indifference at the Wrightville Unit. *See Dulany*, 132 F.3d at 1244 (noting lack of callous comments or actions to support its conclusion that the prison officials were not deliberately indifferent). The corrections employees' minimal and dismissive response to the decedent's condition was clearly suspect. The record

reveals that James had to submit a number of medical requests before receiving medical attention and that his mother made several calls to prison officials, who consistently discounted the complaints.

On July 31, 2003, while in county custody, James developed an ear infection that eventually resulted in hearing loss. At the time of his death, James was still suffering from the infection, and the corrections officials had not yet provided him with a hearing aid. From August 8 to August 29, 2003, James filed at least ten medical service requests complaining of hearing loss, heartburn, and extreme pain in his right shoulder, arm, and wrist. He received no medical attention until August 29, 2003. From August 2003 to November 2003, James's mother called Kay Howell at least thirty times complaining about her son's condition and requesting that he receive medical treatment. In response, Howell, apparently without verifying James's medical condition, told Alberson that James was "faking it."

From August 30 through September 24, 2003, James submitted at least four medical service requests complaining of heavy pain in his ears, head, throat and teeth, and an infected spider bite on his knee. He was not seen until September 24. In late September 2003, James's mother called John Byus who, again apparently without verification, told James's mother that James was "faking it."

On October 12, 2003, James submitted a medical request complaining of severe headaches. He was not admitted to the infirmary until fifteen days later, on October 27. He was released on October 29. That same month, James's mother called Larry Norris's office to complain about the denial of medical treatment. She was told that Norris was not available and transferred to another person who told her that there was nothing wrong with James.

On November 3, James submitted a medical service request complaining of a constant cough, diarrhea, and aching pain in his body that affected his mobility. He

was not seen until four days later on November 7 when he submitted an additional medical service request. On November 9, James's mother visited him, and he was visibly distressed and walking with a limp. Later that night, James called her pleading for her to help him get some medical attention. She called the Wrightsville Unit requesting that someone check on him. She spoke with Lieutenant Tillman, who worked in the diagnostic hospital, and requested that James be examined and hospitalized. Tillman told her that only Byus could order James taken to the hospital and refused to disturb Byus at home. He then also told her that James was "faking it." Two days later, James was seen by Dr. Branch, who diagnosed him as having a chronic cough and persistent sore throat. On November 14, 2003, James was spitting up blood and wheezing in both lungs. Although an x-ray had been ordered days before, it had not yet been performed. James was finally admitted to the infirmary on November 14, but treated only with Tylenol #3. On November 15, 2003, James was still coughing and spitting up blood. He was diagnosed with pneumonia and transferred to Southwest Hospital where he was placed on a mechanical ventilator. At this point James had developed acute renal failure. On November 16, 2003, James was transferred to Jefferson Regional Medical Center, placed on ventilator support, and given dialysis. On November 19, 2003, James passed away.

To receive medical attention, James was required to submit numerous medical requests. When his mother pleaded with corrections employees to check on James's condition, her concerns were met with the callous response, without verification, that James was "faking it." There is sufficient evidence that the corrections employees were aware that James was suffering from serious ongoing health issues, and yet they were deliberately indifferent to his plight. *Dulany*, 132 F.3d at 1239. Alberson testified that James was visibly distressed on November 9, and both James and his mother notified prison officials about James's declining health condition. According to the record, James's condition was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Phillips v. Jasper County Jail*, 437 F.3d 791, 795 (8th Cir. 2006). The corrections employees' continuing statement that

James was "faking it" evidences a "deliberate inaction [by the corrections employees] amounting to callousness." *See Bryan v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998) (per curiam). The fact that James was not given a full and complete physical, though not sufficient on its own, should be considered in determining whether he was deliberately denied proper medical treatment. The rapid decline in James's health condition during his confinement could convince a jury to determine that commonsense would have necessitated a thorough medical exam. There is sufficient evidence in the record for a jury to hold that the corrections employees were deliberately indifferent to James's serious ongoing medical conditions. Thus, a remand for trial is essential.

_____