WR-62,099-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/2/2015 1:12:45 PM
Accepted 4/2/2015 1:35:07 PM
ABEL ACOSTA
CLERK

Cause Number WR-62,099-03

RECEIVED
COURT OF CRIMINAL APPEALS
4/2/2015
ABEL ACOSTA, CLERK

Robert Pruett

vs.

Williams Stephens,

Director, TDCJ, CID

# State's Response to Petition for Writ of Prohibition

On Appeal in Cause Number B-01-M015-0-PR-B

From the 156th District Court of Bee County, Texas

Hon. Bert Richardson, Presiding

Melinda Fletcher
SBN 18403630
Special Prosecution Unit
P O Box 1744
Amarillo, Texas  79105
Phone 806.367.9407
Fax 866.923.9253
mfletcher@sputexas.org

# Table of Contents

Index of Authorities ...................................3

Statement of the Case .................................4

Statement of Facts ....................................5

  Evidence from the Trial ............................5

  Evidence from the DNA Hearing......................16

  Timeline..........................................17

Summary of the Argument ..............................18

Argument .............................................19

 No Negligent Act Was Committed by the State........19

   DNA ..............................................19

    Incentives .......................................21

    Nagle ............................................21

 No Constitutional Violations.......................23

Prayer ...............................................24

Certificate of Compliance ............................25

Certificate of Service ...............................25

# Index of Authorities

**Federal Constitution**

Eighth Amendment ....................................24

Fourteenth Amendment ................................24

**Federal Case Law**

Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285,
    50 L. Ed. 2d 251 (1976).........................25

**Texas State Case Law**

Bell v. State, 90 S.W.3d 301 (Tex. Crim. App. 2002)..23

State v. Holloway, 329 S.W.3d 247 (Tex. App.
    –Texarkana 2010), affirmed 360 S.W.3d 480
    (Tex. Crim. App. 2012)..........................21

Whitaker v. State, 160 S.W.3d 5
    (Tex. Crim. App. 2004)..........................20

Cause Number WR-62,099-03

Robert Pruett

vs.

William Stephens, Director TDCJ, CID

To the Honorable Justices of the Court of Appeals:

Respondent, the State of Texas, respectfully presents this response in opposition to the granting of a Petition for Writ of Prohibition filed on behalf of Robert Lynn Pruett. Pruett's assertions are unsupported and do not rise to the level of evidence needed to grant this writ.

## Statement of the Case

Pruett is scheduled to be executed on April 28, 2015. He seeks a writ of prohibition to halt that execution, alleging violations of the Eighth and Fourteenth Amendments. The State opposes the writ, asserting that

there are no constitutional violations and no evidence to support many of Pruett's allegations.

# Statement of Facts

## Evidence from the Trial[1]

Robert Pruett, Petitioner, was incarcerated at the Texas Department of Criminal Justice - Institutional Division's (hereafter TDCJ-ID) McConnell Unit on December 17, 1999, for the offense of murder. (R.R. 41:135; R.R. 43:8-9) Daniel Nagle, the victim, was employed as a correctional officer at the TDCJ-ID's McConnell Unit and working on that same date. (R.R. 41:50) Nagle's assignment that date was to work alone at the desk in Three Building. (R.R. 41:99) Other corrections officers saw Nagle alive and well at 3:20 and 3:25 p.m. (R.R. 41:263, 276) A few minutes later, Nagle was found stabbed, laying in a pool of blood and unresponsive. (R.R. 41:113) CPR was unsuccessfully performed and Nagle was pronounced dead at 3:55 p.m. on December 17, 1999.

---

[1] All references in this section are to the reporter's record of the original trial, as filed in the direct appeal and the writ of habeas corpus filed with this Court in cause numbers AP-74,370 and WR-62,099-01.

(R.R. 42:236.) The pathologist testified that Nagle died from a heart attack brought on by the stab wounds and assault. (R.R. 44:24.)

Nagle had a reputation among offenders and officers for sticking to the rules and expecting everyone else to do the same. (R.R. 41:86, 155; R.R. 42:49, 143, 171, 211; R.R. 43:16) Although there had been some problems at the unit with corrupt officers, Nagle was not one of them and Nagle had not reported other officers. (R.R. 41:88-97)

Officer Latham testified that on the morning of December 17, 1999, Pruett went to work the fields, which was his normal assignment. (R.R. 41:135-136) When they returned from the fields, Pruett and one other offender pointed out to Latham that they needed new boots. (R.R. 41:136) Latham checked their boots and found they truly did need to be replaced. (R.R. 41:138) He took both offenders to the laundry room and got them new boots. (R.R. 41:136) He then took them to the chow hall but they were finished serving lunch and the chow hall was closed. (R.R. 41:136) Latham got Pruett a "johnny": a sack lunch

with a peanut butter sandwich. (R.R. 41:136-137) Pruett was then sent back to his own building. (R.R. 41:136)

Officer Johnson testified that according to the rules on the unit, there is no problem with an offender having a johnny. However, the offenders are not allowed to take anything, including a johnny, into the recreation yard. (R.R. 41:274) Pruett and Nagle had a heated discussion over Pruett's johnny. (R.R. 41:274) Nagle told Pruett to eat the sandwich, throw it away, or take it to his cell. (R.R. 41:274) Pruett finally ate his sandwich and Nagle then let him into the rec yard. (R.R. 41:287)

On December 17, 1999, Offender Anthony Casey was in a pod preparing to start a tattooing project. (R.R. 42:59) Pruett came into the pod and talked to another offender about a weapon. (R.R. 42:57) After the conversation about the weapon, Pruett went to the showers, opened and closed the door and then immediately returned and told Casey not to start tattooing because something was going to happen. (R.R. 42:57-59) Casey went

to the multipurpose room later and Pruett told him not to come in. (R.R. 42:60)

Offender Jimmy Mullican was standing outside the craft shop on December 17, 1999, when offender Phillips, who was inside the craft shop, asked him to pass some masking tape on to Pruett. (R.R. 42:204) The tape was rolled onto the handle of a toothbrush. (R.R. 42:205) Offender Mullican slid it under the door of the multipurpose room. (R.R. 42:205)

Officer Johnson spoke to Nagle at 3:25 p.m. and then went to take his own lunch break. (R.R. 41:276)

Offender Harold Mitchell was in the multipurpose room on December 17, 1999, when Pruett came in and told him he might want to leave. (R.R. 42:241) Mitchell asked Pruett what he was going to do and Pruett responded "Kill someone." (R.R. 42:241) When asked who, Pruett said "Nagle." (R.R. 42:242) Mitchell tried to calm Pruett and talk him out of hurting Nagle, but Pruett was determined. (R.R. 42:243) Mitchell saw Pruett and Nagle start talking

and as he walked away he heard Nagle say "Inmate stop. What are you doing? Stop." (R.R. 42:244)

Offender Johnny Barnett said that Pruett and Nagle had been having trouble with each other all day. (R.R. 42:12) Barnett heard Nagle say "Look, I'm tearing up the case." and Pruett replied "It's too late for that." (R.R. 42:13) Barnett turned and saw Pruett and Nagle on the floor in the bathroom. Nagle was on his back, holding his hands up in a defensive posture. (R.R. 42:14) Pruett was hitting Nagle in the hands, then moved down his body, and then back up to the face and chest area. (R.R. 42:16) Nagle got up, went to the door and fell back down. Pruett then hit him three more times in the neck. (R.R. 42:16) Pruett was in a rage: he must have had a weapon because Barnett could see all the blood. (R.R. 42:16-17)

Offender Mullican saw Nagle laying on his back with Pruett standing over him. (R.R. 42:209-210) Offender James Dale Keller saw Pruett laying over Nagle in the doorway and he saw Pruett stab Nagle three times. Nagle's hands were not moving at the time. (R.R. 42:153-154) Once

Nagle fell, he never moved again. (R.R. 42:155) Similarly, Offender Lewis saw Pruett on top of Nagle, hitting down on him. (R.R. 42:175) Nagle was not moving. (R.R. 42:177) Lewis did not see a weapon in Pruett's hand, but Pruett was striking Nagle as if Pruett were holding a weapon. (R.R. 42:176) Offender Thompson walked into the multipurpose room of Three Building and saw Pruett and Nagle struggling. (R.R. 41:158) Pruett's arms were swinging in a hitting motion and there was a lot of blood. (R.R. 41:159) Nagle suddenly fell to the floor and Thompson ran away. (R.R. 41:158) Pruett walked out of the room, laid down in front of the desk and put his hands behind his back and waited. (R.R. 41:160, 179) Nobody came to take custody of Pruett, so Pruett got up and left. (R.R. 41:161)

Pruett came to offender Mitchell's pod, very hyped up. Pruett swung his shirt in the air and yelled, "Yeah!" (R.R. 42:244)

Several offenders saw Pruett in the gym wearing bloody clothes. (R.R. 42:125, 209-210; R.R. 43:18, 24)

Pruett's right hand was bleeding. (R.R. 42:127) He washed his hands and it looked like blood was running off of them. (R.R. 42:41, R.R. 43:25) While washing his hands, Pruett asked offender Kirkpatrick if he had an extra change of clothes and then told offender Kirkpatrick not to testify against him. (R.R. 43:26)

Within a few minutes, it was common knowledge among the offenders on the unit that Pruett had killed Nagle. (R.R. 42:43)

Warden Prasifka, Capt. Crites, and Lt. Wallace were together when offender Flaco told them he heard that an officer was being assaulted in Three Building. (R.R. 41:113, 126) They ran to the building and found Nagle on the floor, unresponsive. (R.R. 41:113) They sent the alarm through the unit and attempted to rescue Nagle. (R.R. 41:113, 114)

The stipulated testimony of Dr. Maximiliano J. Herrera was that Officer Nagle was brought into the infirmary with no pulse, no heartbeat, and not breathing. He was unconscious and had no visible reflexes. Dr.

Herrera pronounced Nagle dead at 3:55 p.m. on December 17, 1999. (R.R. 42:236)

Sergeant Ortiz, who responded to Three Building with the officers named above, stayed to lock down the unit. (R.R. 41:226-227) Once the building was secured, he was told to find offenders Pruett and Shelton. (R.R. 41:227) He went the gym where there were about a hundred offenders. (R.R. 41:228) He told them to lineup and show their identification cards: every offender had his card except Pruett. (R.R. 41:228) Ortiz reported back that he had found Pruett without his identification card. (R.R. 41:229) Ortiz then got backup and a video camera and returned to the gym to take Pruett into custody. (R.R. 41:229) When the officers entered the gym, Pruett surrendered without incident. (R.R. 41:230)

They took Pruett to a holding cell and had medical personnel come check on him. (R.R. 41:231) He had an injury to his right thumb. (R.R. 41:251) Pruett told the officers that he injured his thumb on the weight machines. (R.R. 41:255)

Offender Kirkpatrick was a Support Service Inmate (SSI) in Three gym. He has been lifting weights in Three gym for over two years and has never seen Pruett work out with weights. (R.R. 43:31) Offender Jacobs has been lifting weights in TDCJ-ID for about eight years and has never seen anyone injure their thumb on the machines. (R.R. 42:129-131)

Officer King was processing the multipurpose room for evidence. He saw the weapon and also found a torn disciplinary report that Officer Nagle had prepared against Pruett. (R.R. 42:274-277) Baylor reconstructed the report out of seven pieces of paper. (R.R. 42:333) Officer Davis reported that Pruett was joking around during this time while he was in the holding cell. (R.R. 41:250) Pruett told the officers to "go ahead and run that disciplinary case on me now. Oop, I want to call my first witness. Officer Nagle, oop, he's dead." Pruett then laughed. (R.R. 41:251)

Offender Thompson told Officer Gina Dancer what he had seen. (R.R. 41:181) Although he did not name Pruett

at that time, he did tell Dancer which cell the offender lived in and later that evening he picked Pruett out of a photo lineup that Officer Davis showed him. (R.R. 41:191-192; R.R. 41:253-254) Mary Ann Gonzalez, a TDCJ-ID employee who is responsible for housing assignments, confirmed with her records that Pruett was the offender who lived in the cell indicated by Thompson. (R.R. 41:199-200)

Matthew Koenig, investigator for TDCJ-ID's Office of the Inspector General (OIG) saw the weapon in the multipurpose room. He described it as having a masking tape handle, the kind of tape used in the craft shop. (R.R. 41:212-216) The weapon was a steel rod, about seven inches long. It was sharpened to a point on one end and the other end was wrapped in masking tape. (R.R. 42:275-276) This weapon was capable of causing death or serious bodily injury. (R.R. 41:220) It was a deadly weapon: it was not designed for anything else. (R.R. 41:220, R.R. 42:276; R.R. 43:10)

Lisa Harmen Baylor, who is employed in the Texas Department of Public Safety crime lab in Corpus Christi, was responsible for collecting and processing the physical evidence. (R.R. 42:296) According to her, the blood on the sharp end of the weapon was Nagle's. (R.R. 42:337) Baylor was unable to get a DNA profile from the end of the weapon that had been wrapped in tape and was therefore unable to say whose blood it was. (R.R. 42:337) Two pairs of pants and a white towel that Baylor found in the trash can of the gym had Nagle's blood on them. (R.R. 42:346-347, 350) A piece of cloth Baylor found in the hallway had Nagle's blood on it. (R.R. 42:347) This cloth was a pants pocket that came from one of the pairs of pants she recovered from the gym. (R.R. 42:351) Baylor also examined over fifty rolls of masking tape and was able to match the end of the masking tape wrapped around the weapon to the end of a roll of masking tape found in offender Phillips' locked work station. (R.R. 42:279, 338-339)

## Evidence from the DNA Hearing

There was no live testimony presented at the hearing on the Chapter 64 requests. (RR 1) The only evidence is Defendant's Exhibit 1 (DX1), a report from Mitotyping Technologies. The report indicates that Mitotyping Technologies would have conducted the same DNA tests, in the same manner, as the other laboratory. (DX1) There is not, and was not, a sufficient amount and quality of DNA to perform an analysis. (DX1) Mitotyping Technologies would have reported the results as inconclusive, as did the other lab. (DX1)

There is only one allele at one locus that is above the reporting threshold. (DX1) "It is inappropriate to report a match based on one allege at one locus, therefore this result is inconclusive." (DX1) The report concludes:

> "In summary, while it can sometimes be appropriate to analyze STR data below threshold for the purpose of excluding individuals, it is my opinion that it would not be appropriate to do so in this case. This is due to the insufficient DNA in the torn paper sample resulting in a high degree of uncertainty in the peaks observed. Therefore, a meaningful comparison between the torn paper sample and any known samples cannot be performed."

The record is devoid of any mention from any of the three DNA labs that results were not achieved due to inappropriate handling or storage of the evidence.

## Timeline

The major events now at issue in this case occurred in the order shown below.

| | |
|---|---|
| December 1999 | Nagle was murdered and physical evidence was gathered |
| June 2001 | Pruett was indicted |
| April 2002 | Pruett was convicted |
| May 2007 | DPS presents first edition of Best Practices Handbook |
| 2007/2008 | "[a] process known as testing for touch DNA became available." (RR 1:6) |
| October 2012 | DPS presents first edition of Physical Evidence Handbook |
| June 2013 and November 2013 | Pruett requests DNA testing on torn pieces of disciplinary report |

# Summary of the Argument

The State did not violate Pruett's constitutional rights by storing evidence in a manner contrary to guidelines that were published five or more years after the evidence was stored. Possible harm is only suggested by Pruett: there is no evidence that any harm actually occurred in this case.

The evidence at trial included multiple eyewitnesses who saw Pruett murder Nagle. The DNA evidence now sought by Pruett would not exonerate him, even if it does exist and is found. The DNA is located on a state form that is handled by many people, including the printers, shippers, and stockers. It is also feasible to consider that the form may have been handled by multiple inmates who reviewed it to see why Pruett was angry at Nagle.

Pruett has had his due process and is now subject to execution. Writ should not issue to prohibit his execution as ordered by the trial court.

# Argument

## No Negligent Act Was Committed by the State

### DNA

As shown in the Statement of Facts, there is a substantial amount of evidence from various sources, directly probative to Pruett's guilt. More than one witness testified to Pruett's intent and preparation to kill Nagle. More than one witness saw him assaulting Nagle. More than one witness saw him bloody and hyped up after the killing. And immediately after Nagle's death, Pruett laughed and joked that Nagle could no longer pursue the disciplinary action against him. The substantial amount of non-DNA evidence supports the jury's decision to find Pruett guilty. That same evidence also supports the DNA hearing judge's determination that inconclusive post-trial DNA results would not have probably resulted in a different verdict. *See Whitaker v. State*, 160 S.W.3d 5, 9 (Tex. Crim. App. 2004) (finding other evidence of guilt obviated the need for post-trial DNA testing); *and State v. Holloway*, 329 S.W.3d 247, 253

(Tex. App. -Texarkana 2010), *affirmed* 360 S.W.3d 480 (Tex. Crim. App. 2012) (affirming the hearing court's determination unfavorable to the appellant and declaring "[t]here is a substantial amount of other evidence directly probative of whether [appellant] caused the death.").

Pruett complains that the State effectively destroyed evidence by improperly storing it, since at least 2000. There is nothing in the record of this case to indicate that evidence was actually lost or degraded, only Pruett's assertion that the DNA might have been degraded and that it might have been stored at an improper temperature.

Furthermore, the guidelines for storage on which Pruett relies were not released until 2007, the same year the process for extracting DNA from fingerprints became available and five years after trial. It was Pruett who then waited four to six more years to seek to examine or test the evidence.

Further, the DNA results presented at trial in 2002 and those obtained in 2013 are exactly the same. Post-trial testing did manage to obtain one allele at one locus, but the lab wrote that it is inappropriate to report a match based on this one piece of data, and determined that the result was inconclusive. (DX1) In fact, the second post-trial laboratory endorsed and adopted the procedures and findings of the other laboratory. (DX1)

### Incentives

The promises made to testifying inmates were disclosed at trial. There are allegations and innuendo of wrongdoing by the State, but no evidence.

### Nagle

Pruett attempts to argue that there was some grand conspiracy among other TDCJ workers to kill Nagle and frame Pruett for the murder. However, he has no evidence to support his argument.

Pruett directs this Court to a newspaper article that appeared in 2000. That article says unnamed officers told

the writer that Nagle had compiled a lengthy grievance against TDC. The same article says Nagle's alleged file and supporting documents "disappeared" after his death. The evidence at trial was that Nagle had not lodged any complaint against any other officer. (R.R. 41:88-97)

Pruett asserts that the later indictment of several correctional officers was proof of Nagel's investigation and the motive for his murder. This is merely assumption on Pruett's part, it is not supported by any evidence.

There was a wealth of non-DNA testimony presented at trial to establish Pruett's guilt. The post-trial DNA results were inconclusive, just as the pre-trial DNA results had been. And neither established Pruett's innocence. Indeed, even if it were technologically proven that someone else's DNA was on the report, as a result of the other person touching the report, those results would not exonerate Pruett. *See Bell v. State*, 90 S.W.3d 301, 306 (Tex. Crim. App. 2002) ("The presence of another person's DNA at the crime scene will not, without more, constitute affirmative evidence of appellant's

innocence."). Disciplinaries are paper forms that are touched by a multitude of people. Additionally, the prepared disciplinary could have easily been handled by other inmates. But the evidence at trial was that multiple people saw Pruett kill Nagle. The alleged handling of the disciplinary report by another person does not change the facts of this case.

## No Constitutional Violations

Pruett contends that the State violated his constitutional rights under the Eighth and Fourteenth Amendments by not storing the physical evidence in accordance with the standards published by the Texas Department of Public Safety. This argument has two flaws: (1) the two publications were issued five and ten years after the trial of this case; and (2) there is no indication of any actual harm, only the allegation that harm might have resulted under these conditions. Eighth Amendment violations are typically those that are found to be repugnant by the evolving standards of decency that mark the progress of a maturing society. *See Estelle v.*

*Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Failing to foresee technological advances and their requirements more than five years before they appear is not repugnant to our standards of decency.

# Prayer

The State prays that this Honorable Court deny Pruett's Writ of Prohibition.

Respectfully Submitted,

/s/ Melinda Fletcher

Melinda Fletcher
Appellate Attorney
SBN 18403630

Special Prosecution Unit
P O Box 1744
Amarillo, Texas 79105

Phone 806.367.9407
Fax   866.923.9253
mfletcher@sputexas.org

# Certificate of Compliance

I hereby certify that, according to Microsoft Word, this response contains a total of only 3657 words. The length of this document is in compliance with the Texas Rules of Appellate Procedure.

/s/ Melinda Fletcher

Melinda Fletcher

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing Brief for the State was served on David Dow, the attorney for Pruett, via electronic mail on this the 2nd day of April, 2015.

/s/ Melinda Fletcher

Melinda Fletcher