FILED

07/20/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0564

DA 19-0564

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 181N

STATE OF MONTANA,

       Plaintiff and Appellee,

   v.

RYAN WILLIAM MCCAULEY,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-18-095(A)
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

           Shenandoah R. Roath, Shenandoah R. Roath, PLLC, Helena, Montana

           Alisha Backus, Office of the State Public Defender, Kalispell, Montana

       For Appellee:

           Austin Knudsen, Montana Attorney General, C. Mark Fowler, Assistant Attorney General, Helena, Montana

           Travis R. Ahner, Flathead County Attorney, Andrew Clegg, Deputy County Attorney, Kalispell, Montana

Submitted on Briefs:  April 21, 2021

Decided:  July 20, 2021

Filed:

                _____
                              Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Ryan William McCauley appeals the December 4, 2018 denial of his motion to dismiss multiple counts of assault on a peace officer. We affirm.

¶3 This case presents a classic example of why criminal justice solutions to mental health conditions are often inappropriate. After calling a suicide hotline for assistance, Ryan William McCauley (McCauley) ended up with two felony convictions and a lengthy stay in the Flathead County Detention Center (FCDC) that he alleges was without access to adequate mental health services.

¶4 On February 8, 2018, the Flathead County Sheriff's Office was dispatched for a welfare check on McCauley following a report from a suicide hotline operator. Deputy Dustin Andersen (Andersen) first contacted McCauley by phone and McCauley indicated that he "did not want to live anymore" and planned to take his life at midnight. McCauley agreed to meet with Andersen on the condition that Anderson came alone and stayed more than ten feet away. Andersen subsequently made contact with McCauley outside of a Kalispell sandwich shop. McCauley told Andersen that he had a knife and, when asked, showed where it was located. After some negotiation with Andersen,

2

McCauley agreed to accompany Andersen to a mental health facility so long as no one touched him or took away his freedom to leave. When another officer arrived, McCauley reacted: "that's not going to work." Negotiations apparently broke down at this point, with McCauley declining to give up his knife in the presence of armed officers.

¶5 According to the District Court's viewing of body camera footage,[1] McCauley could be seen requesting an officer to "please stay at that distance, sir," before asking Andersen for his "word as a United States Marine," at which point several other officers moved in to restrain McCauley. In the resulting scuffle, during which McCauley bit three officers—reasoning aloud, "I've already got one felony,"—McCauley repeatedly asked to "talk to the marine" with whom he would cooperate if he would get "these guys away from me." While being handcuffed, McCauley stated, "looks like I can't trust the marines anymore" and "this is why I want to kill myself." Attempting to get McCauley to stand up, Andersen offered: "I didn't know they were going to do that" while Flathead County Sheriff Chuck Curry displayed his bleeding hand to McCauley and stated "that just bought you a felony, my friend." The struggle continued as McCauley was restrained with leg straps and loaded into a patrol vehicle. McCauley was not taken to a hospital or to see a mental health professional but was taken directly to FCDC.

¶6 McCauley was charged with three counts of assault on a peace officer, a felony, in violation of § 45-5-210, MCA. On February 9, 2018, a justice of the peace issued an Order to Detain Prisoner on Probation/Parole Warrant stating that McCauley had been arrested

---

[1] This footage is described in detail in the District Court's Order but was not provided to this Court as part of the record on appeal.

the previous day "under authority of a Warrant issued by an agent of the Department of Corrections, Probation and Parole Bureau" and providing that, "[p]ending the filing of a Petition to Revoke in the underlying felony matter the Defendant is remanded to the custody of the Flathead County Sheriff and shall remain incarcerated until further order of the Court or the posting of bail."[2]  Another February 9, 2018 order set bail at $150,000 and ordered that McCauley "shall reside at FCDC."  The record does not show that McCauley moved to reduce bail or requested to be released on his own recognizance to seek treatment.

¶7    In an April 25, 2018 pre-trial Omnibus Order stipulated to by the parties, Defense Counsel indicated that it intended to "introduce evidence to support the defense that because of a mental disease or disorder the Defendant did not have a particular state of mind that is an essential element of the offense charged."  Defense Counsel requested a mental health evaluation from licensed psychologist Vincent River (River) to determine whether McCauley could "appreciate the criminality of his conduct at the time it was occurring or if it was a reaction due to his mental illness."  In a written report filed with the court on June 19, 2018, River found evidence of ongoing mental illness, significant difficulty with thinking rationally, coherently, and in a goal-directed manner, and that McCauley's fight or flight instinct is triggered in altercations with authority.  River's report stated that "[t]his 28-year old single African American male presents with a complex diagnostic picture" and that the evaluation results "show mixed validity."  The report

---

[2] A subsequent presentence investigation indicated that McCauley was facing a pending Revocation of Suspended/Deferred Sentence in Ravalli County for which a warrant was issued on March 1, 2018.

4

determined that McCauley likely suffers from a variety of mental disorders. However, River concluded that McCauley most likely "acted with knowledge and purpose in resisting arrest" and with the "capacity to recognize right from wrong," but noted that McCauley's mental illness "substantially lower[ed] his ability to conform his behavior to the requirements of the law, in this situation where the police officers were, by all appearances, the aggressors." River also noted:

> In a jail environment, it appears Mr. McCauley's functioning is somewhat stabilized and improved. However, this is most likely an artifact of the security he derives from being in an institution. He is not currently under any form of psychiatric treatment. There does not appear to be a need for commitment to the Montana State Hospital at the present time, because his risk of suicidal behavior appears lessened in the jail setting. However, his ongoing risk of suicidal impulse is considered high if he is returned to the street without vocational and treatment supports.

¶8 River recommended sentencing McCauley to the custody of the Department of Public Health and Human Services (DPHHS) for mental health services and treatment, substance abuse treatment, psychiatric treatment, mental health counseling, and vocational training. River noted that McCauley "appears to be in need of treatment to reduce his distress from depression and anxiety symptoms and to lower his risk of suicidal behavior."

¶9 McCauley entered into a plea agreement with the State, filed with the District Court on June 25, 2018, in which he pled guilty, but mentally ill, to Counts I and II in exchange for the State dismissing Count III and recommending a concurrent five-year commitment for Counts I and II to the custody of the director of DPHHS to be placed, if recommended after evaluation, in an appropriate correctional facility, mental health facility, residential facility, or developmental disabilities facility for custody, care, and treatment.

5

¶10 At a June 25, 2018 change of plea hearing, McCauley indicated that he understood that his plea agreement "would require [him] to go to the State Hospital to undergo a second evaluation." The District Court indicated uncertainty regarding whether McCauley's plea required that he be sent to the Montana State Hospital (MSH) for an evaluation prior to or after sentencing. The parties discussed § 46-14-311, MCA, which calls for an evaluation to determine whether a defendant's culpability was reduced by a "mental disease or disorder or developmental disability." They also discussed § 46-14-312, MCA, which requires the court to sentence individuals found to have such a disorder to DPHHS custody but allows DPHHS to petition for sentence review if subsequent evaluation leads it to believe that the defendant is no longer appropriate for DPHHS custody.

¶11 Defense Counsel warned that the last person her office sent to MSH for a mental evaluation had waited eight months and suggested that the court could proceed to sentencing sooner by relying on River's report instead. After discussion with counsel, the District Court concluded that, pursuant to § 46-14-311(2), MCA, a mental evaluation must be conducted prior to going forward with sentencing. Moreover, upon realizing that River was not a "person appointed by" DPHHS pursuant to § 46-14-311, MCA, the District Court concluded that River's report was insufficient and that an evaluation through MSH would be conducted as part of a presentence investigation (PSI) prior to proceeding with sentencing.

¶12 On June 28, 2018, the District Court ordered a mental health evaluation be conducted through MSH to be incorporated into a PSI pursuant to § 46-14-311, MCA. The court set sentencing for October 11, 2018. However, shortly before the scheduled

6

sentencing date, the Montana Department of Corrections Probation and Parole Bureau notified the District Court that the PSI was not complete, as it had not yet received the mental health evaluation from MSH. McCauley had continued to reside at FCDC while awaiting transfer to MSH, where the mental evaluation was to be conducted. At the October 11, 2018 hearing, the District Court indicated that it was unable to proceed without the PSI and Defense Counsel requested a hearing on a motion to dismiss, alleging a violation of McCauley's constitutional due process rights and right against cruel and unusual punishment.

¶13 At a November 27, 2018 hearing on his motion to dismiss, McCauley testified that, despite having asked to see mental health professionals on more than one occasion, he received no treatment, counseling, or medication for his mental health needs while at FCDC. He described being placed under suicide watch and that someone he described as a "mental health tech" asking him questions that he thought could have been a screening for his risk of self-harm. He recounted multiple stints in isolation, limited access to fresh air or exercise, and spartan living conditions. McCauley testified that, after arrival at FCDC, his suicidal ideations had become clearer, with a focus on how to "avoid people interfering next time." He described increased anxiety while in solitary confinement in a twelve-by-eight-foot cell in "max." He testified to having "no relief" at FCDC and dealing with the stress of having to mask his mental vulnerabilities from other inmates to avoid being singled out.

¶14 Jennifer Ball (Ball), a Licensed Clinical Social Worker for the Office of the Public Defender testified to systemic nationwide shortfalls in providing mental health services to

inmates and testified to the detrimental effects of solitary confinement on inmates with health care needs. Ball also testified that recent mental health budget cuts had led to increased wait times at MSH and testified that officials at FCDC "do the best they can with what they've got" in terms of meeting inmates' mental health needs, though she did not specify what that entailed. Ball did testify that she believed that FCDC had a "tele-med" option. Ball had not met with McCauley.[3]

¶15    In a December 4, 2018 order, the District Court denied McCauley's motion to dismiss. The court found the delay in obtaining a mental health evaluation to be "inordinate" and "indefensible" and acknowledged "systemic shortfalls at addressing mental health" for inmates at FCDC. However, the District Court determined that McCauley had failed to support his due process claim with a showing of substantial or demonstrable prejudice caused by the delay and found no evidence of "deliberate indifference" on the part of FCDC toward McCauley's healthcare needs that would violate his right against cruel and unusual punishment. Furthermore, the District Court again concluded that River's report was not a "'mental evaluation by a person appointed by the director of the department of public health and human services'" and therefore could not be substituted for an MSH evaluation to be included in a PSI pursuant to § 46-14-311, MCA.[4]

---

[3] Neither party presented significant additional evidence as to the mental condition of McCauley or the services available at FCDC.

[4] Though not mentioned in the District Court Order, the logjam had apparently been broken by the time the District Court issued its Order, as McCauley was finally taken to MSH for the requested evaluation the day after the hearing on the motion to dismiss. The evaluation, filed with the court

¶16 On August 1, 2019, the court sentenced McCauley to two concurrent five-year commitments to the Department of Corrections, each with five years suspended. McCauley was credited with 533 days served. McCauley appeals the December 4, 2018 Order denying his motion to dismiss and requests a remedy of dismissal or vacatur of his sentence.

¶17 A district court's denial of a motion to dismiss is reviewed de novo. *State v. G'Stohl*, 2010 MT 7, ¶ 7, 355 Mont. 43, 223 P.3d 926. We review the district court's interpretation and application of the law de novo for correctness. *State v. Betterman*, 2015 MT 39, ¶ 11, 378 Mont. 182, 342 P.3d 971. A district court's underlying findings of fact are reviewed for clear error, where a finding of fact is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *Betterman*, ¶ 11. District court decisions that reach the right result, even by relying on the wrong reason, will be affirmed. *Betterman*, ¶ 11.

¶18 Pursuant to § 46-14-311(1), MCA, a defendant may claim before the sentencing court that "at the time of the commission of the offense of which convicted the defendant was suffering from a mental disease or disorder or developmental disability that rendered the defendant unable to appreciate the criminality of the defendant's behavior or to conform the defendant's behavior to the requirements of law." In assessing this claim, "the

as part of McCauley's PSI on January 18, 2019, concluded that McCauley's diagnoses did not meet the criteria for a mental disease or disorder under § 46-14-101(2)(a), MCA, and that, in the opinion of the evaluators, the court should sentence McCauley to the Department of Corrections, not DPHHS.

sentencing court shall consider any relevant evidence presented at the trial and may also consider the results of the presentence investigation," which, if requested, "must include a mental evaluation by a person appointed by the director of the department of public health and human services or the director's designee," providing an opinion on the issue. Section 46-14-311, MCA.

¶19  Essentially, the sentencing court here requested a PSI in addressing McCauley's claim of a mental defect or disorder affecting his ability to appreciate the criminality of his actions or conform his conduct to the law. When the mental evaluation that was required to be included with such a PSI pursuant to § 46-14-311, MCA, failed to be completed by the scheduled sentencing date, the court postponed sentencing until the PSI was complete. As a result, McCauley continued to await sentencing at FCDC, apparently without substantial mental health services, for over nine months until the hearing on his motion to dismiss. McCauley asserts that, as alternatives to subjecting McCauley to such a delay, the District Court could have (a) proceeded to sentence McCauley without a PSI, relying instead on the information contained in River's report, or (b) directed DPHHS to appoint another community-based mental health professional to conduct the evaluation in a more timely fashion.

¶20  McCauley first argues that the District Court's decision not to pursue either of the alternatives proposed above was due to its misreading of § 46-14-311, MCA. In its Order denying McCauley's motion to dismiss, the District Court stated that, under § 46-14-311, MCA, "the sentencing court shall 'consider any relevant evidence presented at the trial and *shall* also consider the results of the presentence investigation.'"

10

(Emphasis added.)  Section 46-14-311(1), MCA, actually provides that "the sentencing court shall consider any relevant evidence presented at the trial and *may* also consider the results of the presentence investigation . . . ."  (Emphasis added.) The District Court thereby misquoted § 46-14-311(1), MCA, by replacing a "may" with a "shall."

¶21    It appears possible that the District Court was operating under the belief that it had less discretion to forego a PSI under § 46-14-311(1), MCA, than it actually did.  While nothing in § 46-14-311(1), MCA, appears to require a PSI, neither does it forbid one, and we need not reverse a District Court decision that arrives at an acceptable result even by way of the wrong reason.  *Betterman*, ¶ 11.  McCauley alleges that his lengthy pre-sentencing detention without adequate mental health services violated statutory and constitutional provisions.  Thus, the relevant question is *whether* the resulting detention violated McCauley's rights, not *why* the District Court did not choose an alternative route to avert it.[5]

¶22    McCauley also argues that the wide range in wait times for defendants awaiting mental evaluations prior to sentencing violates § 46-18-101(3), MCA, which provides that "the state of Montana adopts the following principles: (a) Sentencing and punishment must be certain, timely, consistent, and understandable."  According to McCauley, wait times for presentence evaluations at MSH in recent years have ranged from 15 days to 282 days. McCauley essentially contends that sentencing judges must forego a PSI for a defendant

---

[5] Notably, the District Court's inaccurate quotation of the statute occurred in the context of addressing whether River's report could qualify as an evaluation to be used in a PSI, not whether a PSI could be foregone altogether.

11

making a claim for reduced mental culpability under § 46-14-311, MCA, lest punishment be untimely or inconsistent, in violation of § 46-18-101(3), MCA.

¶23 We agree that the extensive wait times to receive an evaluation from MSH are troubling. However, countervailing statutory provisions support a sentencing judge's decision not to forego a PSI altogether. Section 46-18-101, MCA, provides that it is among the policies and principles of the State of Montana to "punish each offender commensurate with the nature and degree of harm caused by the offense and to hold an offender accountable," to impose sentences "commensurate with the punishment imposed on other persons committing the same offenses," and to exercise judicial discretion to "consider aggravating and mitigating circumstances." Furthermore, a judge must "clearly state for the record the reasons for imposing the sentence." Section 46-18-102(3)(b), MCA.

¶24 These provisions necessitate that a judge seek to be fully informed when fashioning a proper sentence, no less so for a defendant who may have reduced culpability due to mental health reasons. A completed PSI (with the accompanying mental evaluation) is a method by which a sentencing judge may seek such information, particularly where, as here, there was no trial from which a judge might otherwise gather relevant information on the matter. While the potential for substantial delay in receiving a PSI that includes a department-approved mental evaluation is disconcerting, we cannot say that it has become so egregious that a District Court commits a per se violation of § 46-18-101(3), MCA, by requesting the guidance of such an evaluation before pronouncing a sentence.

¶25 Finally, McCauley argues that the delay in sentencing and accompanying lack of mental health treatment violated his constitutional right to due process. McCauley also

12

asserts that the District Court applied the wrong standard and failed to analyze his argument that the government exhibited "deliberate indifference" toward McCauley's need for mental health services.

¶26 As an initial matter, we reject the State's argument that McCauley "acquiesced" to the delay when he entered into his plea bargain and expressed consent to being evaluated by DPHHS. McCauley's exercise of his right under § 46-14-311, MCA, to have the sentencing court consider his claim that he was "unable to appreciate the criminality of [his] behavior or to conform [his] behavior to the requirements of the law" is not conditioned on a waiver of his constitutional rights.

¶27 This Court held in *Betterman*, ¶ 32, that a defendant's due process rights are violated by a post-conviction, pre-sentencing delay that is both purposeful and oppressive. However, the *Betterman* Court determined that a constitutional violation could still be found even if the cause for the delay was less than purposeful or that the prejudice resulting from the delay was less than oppressive. *Betterman*, ¶ 32.

¶28 Here, McCauley presented no evidence that the delay was purposeful, either on the part of MSH or the District Court. Rather, McCauley argues that the delay resulted from inadequate bedspace at MSH. The District Court heard evidence that systemic funding shortfalls caused institutional delays for those seeking a mental health evaluation.

¶29 With regard to prejudice, the District Court heard testimony from Ball regarding the generally harmful effects of conditions of confinement in underequipped jails such as FCDC on individuals with mental health needs. However, she had no personal knowledge regarding McCauley and his specific experience. McCauley testified to a sharpening of

13

his suicidal ideations after his arrival at FCDC, and a worsening of his anxiety during his stints in solitary confinement, a feeling of having "no relief" at FCDC, and the stress of disguising his mental vulnerabilities from other inmates.

¶30 However, the report prepared by River, who was retained by defense counsel, found that McCauley had "somewhat stabilized and improved" in the jail setting and that his risk of "suicidal behavior appears lessened." McCauley challenges the validity of this report in determining whether McCauley had suffered prejudice while at FCDC, pointing out that the evaluation was conducted on March 9, 2018, at which point McCauley had completed only one of the approximately nine months he would ultimately spend at FCDC prior to the hearing on his motion to dismiss.

¶31 Regardless, this report did nothing to sound the alarm bells regarding McCauley's mental health status while at FCDC. Similarly, McCauley's testimony that someone at FCDC had screened him for risk of self-harm before he was taken off suicide watch confirms River's conclusion that McCauley had stabilized. Notwithstanding McCauley's testimony of stints of suicidal ideation, anxiety, and stress while at FCDC, the District Court credited River's report in determining that, regardless of the effects of such conditions of confinement upon those with mental health needs generally, McCauley himself suffered neither "substantial nor demonstrable" prejudice due to the length of his pre-sentencing delay. We cannot say that the District Court erred in reaching this conclusion.

¶32 McCauley asserts that the District Court improperly considered McCauley's failure to seek release on his own recognizance to pursue health care in the community as a factor

14

weighing against a finding of substantial prejudice. McCauley argues that he was being held by the Department of Corrections for an unresolved revocation proceeding in another county and could not have been released into the community regardless. Again, we cannot say that the District Court's consideration of this factor was error.

¶33 McCauley contends that the *Betterman* standard is inappropriate for addressing allegations of inadequate treatment. McCauley argues that a more suitable legal standard for examining the conditions of McCauley's confinement at FCDC can be found in Eighth Amendment jurisprudence, under which prison officials may not act with "*deliberate indifference* to serious medical needs of prisoners" or in knowing disregard of an "excessive risk to inmate health or safety." *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S. Ct. 285, 291 (1976) (emphasis added); *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994).

¶34 The "deliberate indifference" standard encompasses a culpable level of subjective intent on the part of an official. *See Farmer*, 511 U.S. at 837-39, 114 S. Ct. at 1979-80 (requiring knowing disregard of an "excessive risk to inmate health or safety" to find a prison official liable for inhumane conditions under the Eighth Amendment). As the District Court noted, officials at FCDC do "the best they can with what they've got." FCDC did respond to McCauley's suicidality by placing him on suicide watch and, apparently, obtaining a mental health risk screening prior to removing him from the watch list. There is nothing in this record that leads us to conclude that FCDC, the District Court, or other officials were deliberately indifferent to McCauley's situation.

¶35 The District Court did not commit reversible error by misquoting § 46-14-311(1), MCA, and did not violate the purpose and policy provisions of § 46-18-101(3), MCA, by denying McCauley's motion to dismiss. We do not find McCauley's delay in sentencing and conditions of confinement unconstitutional here, as he has not shown deliberate indifference on the part of the relevant government officials nor that his presentencing delay was purposeful or resulted in substantial and demonstrable prejudice.

¶36 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶37 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ JIM RICE